# Exhibit A

3/31/16 @ 3pm

SUM-100

FOR COURT USE ONLY
(SOLO PARA USO DE LA CORTE)

ELECTRONICALLY FILED
Superior Court of California,
County of San Diego
03/30/2016 at 11:56:52 AM
Clerk of the Superior Court
By Jessica Pascual,Deputy Clerk

# SUMMONS
## (CITACION JUDICIAL)

**NOTICE TO DEFENDANT:**
***(AVISO AL DEMANDADO):***
FCA US LLC, a Delaware Limited Liability Company; PECK JEEP EAGLE, INC., a California Corporation dba MIDWAY JEEP CHRYSLER; and DOES 1 through 10, inclusive,

**YOU ARE BEING SUED BY PLAINTIFF:**
***(LO ESTÁ DEMANDANDO EL DEMANDANTE):***
PETER PETROPOULOS and CONNIE NELSON

**NOTICE!** You have been sued. The court may decide against you without your being heard unless you respond within 30 days. Read the information below.

You have 30 CALENDAR DAYS after this summons and legal papers are served on you to file a written response at this court and have a copy served on the plaintiff. A letter or phone call will not protect you. Your written response must be in proper legal form if you want the court to hear your case. There may be a court form that you can use for your response. You can find these court forms and more information at the California Courts Online Self-Help Center (*www.courtinfo.ca.gov/selfhelp*), your county law library, or the courthouse nearest you. If you cannot pay the filing fee, ask the court clerk for a fee waiver form. If you do not file your response on time, you may lose the case by default, and your wages, money, and property may be taken without further warning from the court.

There are other legal requirements. You may want to call an attorney right away. If you do not know an attorney, you may want to call an attorney referral service. If you cannot afford an attorney, you may be eligible for free legal services from a nonprofit legal services program. You can locate these nonprofit groups at the California Legal Services Web site (*www.lawhelpcalifornia.org*), the California Courts Online Self-Help Center (*www.courtinfo.ca.gov/selfhelp*), or by contacting your local court or county bar association. **NOTE:** The court has a statutory lien for waived fees and costs on any settlement or arbitration award of $10,000 or more in a civil case. The court's lien must be paid before the court will dismiss the case.

*¡AVISO! Lo han demandado. Si no responde dentro de 30 días, la corte puede decidir en su contra sin escuchar su versión. Lea la información a continuación.*

*Tiene 30 DÍAS DE CALENDARIO después de que le entreguen esta citación y papeles legales para presentar una respuesta por escrito en esta corte y hacer que se entregue una copia al demandante. Una carta o una llamada telefónica no lo protegen. Su respuesta por escrito tiene que estar en formato legal correcto si desea que procesen su caso en la corte. Es posible que haya un formulario que usted pueda usar para su respuesta. Puede encontrar estos formularios de la corte y más información en el Centro de Ayuda de las Cortes de California (www.sucorte.ca.gov), en la biblioteca de leyes de su condado o en la corte que le quede más cerca. Si no puede pagar la cuota de presentación, pida al secretario de la corte que le dé un formulario de exención de pago de cuotas. Si no presenta su respuesta a tiempo, puede perder el caso por incumplimiento y la corte le podrá quitar su sueldo, dinero y bienes sin más advertencia.*

*Hay otros requisitos legales. Es recomendable que llame a un abogado inmediatamente. Si no conoce a un abogado, puede llamar a un servicio de remisión a abogados. Si no puede pagar a un abogado, es posible que cumpla con los requisitos para obtener servicios legales gratuitos de un programa de servicios legales sin fines de lucro. Puede encontrar estos grupos sin fines de lucro en el sitio web de California Legal Services, (www.lawhelpcalifornia.org), en el Centro de Ayuda de las Cortes de California, (www.sucorte.ca.gov) o poniéndose en contacto con la corte o el colegio de abogados locales. AVISO: Por ley, la corte tiene derecho a reclamar las cuotas y los costos exentos por imponer un gravamen sobre cualquier recuperación de $10,000 ó más de valor recibida mediante un acuerdo o una concesión de arbitraje en un caso de derecho civil. Tiene que pagar el gravamen de la corte antes de que la corte pueda desechar el caso.*

The name and address of the court is:
*(El nombre y dirección de la corte es):*
Hall of Justice Courthouse
330 W. Broadway
San Diego, CA 92101

CASE NUMBER: *(Número del Caso):* 37-2016-00010501-CU-BC-CTL

The name, address, and telephone number of plaintiff's attorney, or plaintiff without an attorney, is:
*(El nombre, la dirección y el número de teléfono del abogado del demandante, o del demandante que no tiene abogado, es):*
O'Connor & Mikhov LLP
1801 Century Park East, Suite 2300, Los Angeles, CA 90067
(310) 552-2250

DATE: *(Fecha)* 03/30/2016 Clerk, by *(Secretario)* J. Pascual (signature) J. Pascual, Deputy *(Adjunto)*

*(For proof of service of this summons, use* Proof of Service of Summons *(form POS-010).)*
*(Para prueba de entrega de esta citatión use el formulario* Proof of Service of Summons, *(POS-010)).*

[SEAL]
Superior Court of California, County of San Diego

**NOTICE TO THE PERSON SERVED:** You are served

1. ☐ as an individual defendant.
2. ☐ as the person sued under the fictitious name of *(specify)*:
3. [XX] on behalf of *(specify)*: FCA US LLC, a Delaware Limited Liability Company

under:
- ☐ CCP 416.10 (corporation)
- ☐ CCP 416.20 (defunct corporation)
- ☐ CCP 416.40 (association or partnership)
- ☐ CCP 416.60 (minor)
- ☐ CCP 416.70 (conservatee)
- ☐ CCP 416.90 (authorized person)
- [XX] other *(specify)*: Corporation Code 17061 (Limited Liability Company)

4. ☐ by personal delivery on *(date)*:





American LegalNet, Inc.
www.FormsWorkflow.com

CM-010

ATTORNEY OR PARTY WITHOUT ATTORNEY (Name, State Bar number, and address):
Steve Mikhov (SBN 224676)
O'Connor & Mikhov LLP
1801 Century Park East, Suite 2300, Los Angeles, CA 90067
TELEPHONE NO.: (310) 552-2250 FAX NO.: (310) 552-7973
ATTORNEY FOR (Name): PETER PETROPOULOS and CONNIE NELSON

FOR COURT USE ONLY

ELECTRONICALLY FILED
Superior Court of California,
County of San Diego
03/30/2016 at 11:56:52 AM
Clerk of the Superior Court
By Jessica Pascual,Deputy Clerk

SUPERIOR COURT OF CALIFORNIA, COUNTY OF San Diego
STREET ADDRESS: 330 West Broadway
MAILING ADDRESS: 330 West Broadway
CITY AND ZIP CODE: San Diego, CA 92101
BRANCH NAME: Hall of Justice Courthouse

CASE NAME: PETER PETROPOULOS and CONNIE NELSON,
v. FCA US LLC, a Delaware Limited Liability Company, et al.

## CIVIL CASE COVER SHEET

☒ Unlimited (Amount demanded exceeds $25,000) ☐ Limited (Amount demanded is $25,000 or less)

Complex Case Designation
☐ Counter ☐ Joinder
Filed with first appearance by defendant (Cal. Rules of Court, rule 3.402)

CASE NUMBER: 37-2016-00010501-CU-BC-CTL
JUDGE: Judge Gregory W Pollack
DEPT:

*Items 1–6 below must be completed (see instructions on page 2).*

1. Check **one** box below for the case type that best describes this case:

**Auto Tort**
☐ Auto (22)
☐ Uninsured motorist (46)

**Other PI/PD/WD (Personal Injury/Property Damage/Wrongful Death) Tort**
☐ Asbestos (04)
☐ Product liability (24)
☐ Medical malpractice (45)
☐ Other PI/PD/WD (23)

**Non-PI/PD/WD (Other) Tort**
☐ Business tort/unfair business practice (07)
☐ Civil rights (08)
☐ Defamation (13)
☐ Fraud (16)
☐ Intellectual property (19)
☐ Professional negligence (25)
☐ Other non-PI/PD/WD tort (35)

**Employment**
☐ Wrongful termination (36)
☐ Other employment (15)

**Contract**
☒ Breach of contract/warranty (06)
☐ Rule 3.740 collections (09)
☐ Other collections (09)
☐ Insurance coverage (18)
☐ Other contract (37)

**Real Property**
☐ Eminent domain/Inverse condemnation (14)
☐ Wrongful eviction (33)
☐ Other real property (26)

**Unlawful Detainer**
☐ Commercial (31)
☐ Residential (32)
☐ Drugs (38)

**Judicial Review**
☐ Asset forfeiture (05)
☐ Petition re: arbitration award (11)
☐ Writ of mandate (02)
☐ Other judicial review (39)

**Provisionally Complex Civil Litigation (Cal. Rules of Court, rules 3.400–3.403)**
☐ Antitrust/Trade regulation (03)
☐ Construction defect (10)
☐ Mass tort (40)
☐ Securities litigation (28)
☐ Environmental/Toxic tort (30)
☐ Insurance coverage claims arising from the above listed provisionally complex case types (41)

**Enforcement of Judgment**
☐ Enforcement of judgment (20)

**Miscellaneous Civil Complaint**
☐ RICO (27)
☐ Other complaint *(not specified above)* (42)

**Miscellaneous Civil Petition**
☐ Partnership and corporate governance (21)
☐ Other petition *(not specified above)* (43)

2. This case ☐ is ☒ is not complex under rule 3.400 of the California Rules of Court. If the case is complex, mark the factors requiring exceptional judicial management:
   a. ☐ Large number of separately represented parties
   b. ☐ Extensive motion practice raising difficult or novel issues that will be time-consuming to resolve
   c. ☐ Substantial amount of documentary evidence
   d. ☐ Large number of witnesses
   e. ☐ Coordination with related actions pending in one or more courts in other counties, states, or countries, or in a federal court
   f. ☐ Substantial postjudgment judicial supervision
3. Remedies sought *(check all that apply)*: a. ☒ monetary b. ☒ nonmonetary; declaratory or injunctive relief c. ☒ punitive
4. Number of causes of action *(specify)*: 4
5. This case ☐ is ☒ is not a class action suit.
6. If there are any known related cases, file and serve a notice of related case. *(You may use form CM-015.)*

Date: 3/29/16
Steve Mikhov
(TYPE OR PRINT NAME) ▶ (SIGNATURE OF PARTY OR ATTORNEY FOR PARTY)

**NOTICE**
- Plaintiff must file this cover sheet with the first paper filed in the action or proceeding (except small claims cases or cases filed under the Probate Code, Family Code, or Welfare and Institutions Code). (Cal. Rules of Court, rule 3.220.) Failure to file may result in sanctions.
- File this cover sheet in addition to any cover sheet required by local court rule.
- If this case is complex under rule 3.400 et seq. of the California Rules of Court, you must serve a copy of this cover sheet on **all** other parties to the action or proceeding.
- Unless this is a collections case under rule 3.740 or a complex case, this cover sheet will be used for statistical purposes only.



Form Adopted for Mandatory Use
Judicial Council of California
CM-010 [Rev. July 1, 2007]



Cal. Rules of Court, rules 2.30, 3.220, 3.400–3.403, 3.740;
Cal. Standards of Judicial Administration, std. 3.10
www.courtinfo.ca.gov

CM-010

## INSTRUCTIONS ON HOW TO COMPLETE THE COVER SHEET

**To Plaintiffs and Others Filing First Papers.** If you are filing a first paper (for example, a complaint) in a civil case, you **must** complete and file, along with your first paper, the *Civil Case Cover Sheet* contained on page 1. This information will be used to compile statistics about the types and numbers of cases filed. You must complete items 1 through 6 on the sheet. In item 1, you must check **one** box for the case type that best describes the case. If the case fits both a general and a more specific type of case listed in item 1, check the more specific one. If the case has multiple causes of action, check the box that best indicates the **primary** cause of action. To assist you in completing the sheet, examples of the cases that belong under each case type in item 1 are provided below. A cover sheet must be filed only with your initial paper. Failure to file a cover sheet with the first paper filed in a civil case may subject a party, its counsel, or both to sanctions under rules 2.30 and 3.220 of the California Rules of Court.

**To Parties in Rule 3.740 Collections Cases.** A "collections case" under rule 3.740 is defined as an action for recovery of money owed in a sum stated to be certain that is not more than $25,000, exclusive of interest and attorney's fees, arising from a transaction in which property, services, or money was acquired on credit. A collections case does not include an action seeking the following: (1) tort damages, (2) punitive damages, (3) recovery of real property, (4) recovery of personal property, or (5) a prejudgment writ of attachment. The identification of a case as a rule 3.740 collections case on this form means that it will be exempt from the general time-for-service requirements and case management rules, unless a defendant files a responsive pleading. A rule 3.740 collections case will be subject to the requirements for service and obtaining a judgment in rule 3.740.

**To Parties in Complex Cases.** In complex cases only, parties must also use the *Civil Case Cover Sheet* to designate whether the case is complex. If a plaintiff believes the case is complex under rule 3.400 of the California Rules of Court, this must be indicated by completing the appropriate boxes in items 1 and 2. If a plaintiff designates a case as complex, the cover sheet must be served with the complaint on all parties to the action. A defendant may file and serve no later than the time of its first appearance a joinder in the plaintiff's designation, a counter-designation that the case is not complex, or, if the plaintiff has made no designation, a designation that the case is complex.

### CASE TYPES AND EXAMPLES

**Auto Tort**
- Auto (22)–Personal Injury/Property Damage/Wrongful Death
- Uninsured Motorist (46) *(if the case involves an uninsured motorist claim subject to arbitration, check this item instead of Auto)*

**Other PI/PD/WD (Personal Injury/ Property Damage/Wrongful Death) Tort**
- Asbestos (04)
  - Asbestos Property Damage
  - Asbestos Personal Injury/ Wrongful Death
- Product Liability *(not asbestos or toxic/environmental)* (24)
- Medical Malpractice (45)
  - Medical Malpractice– Physicians & Surgeons
  - Other Professional Health Care Malpractice
- Other PI/PD/WD (23)
  - Premises Liability (e.g., slip and fall)
  - Intentional Bodily Injury/PD/WD (e.g., assault, vandalism)
  - Intentional Infliction of Emotional Distress
  - Negligent Infliction of Emotional Distress
  - Other PI/PD/WD

**Non-PI/PD/WD (Other) Tort**
- Business Tort/Unfair Business Practice (07)
- Civil Rights (e.g., discrimination, false arrest) *(not civil harassment)* (08)
- Defamation (e.g., slander, libel) (13)
- Fraud (16)
- Intellectual Property (19)
- Professional Negligence (25)
  - Legal Malpractice
  - Other Professional Malpractice *(not medical or legal)*
- Other Non-PI/PD/WD Tort (35)

**Employment**
- Wrongful Termination (36)
- Other Employment (15)

**Contract**
- Breach of Contract/Warranty (06)
  - Breach of Rental/Lease
    - Contract *(not unlawful detainer or wrongful eviction)*
  - Contract/Warranty Breach–Seller
    - Plaintiff *(not fraud or negligence)*
  - Negligent Breach of Contract/ Warranty
  - Other Breach of Contract/Warranty
- Collections (e.g., money owed, open book accounts) (09)
  - Collection Case–Seller Plaintiff
  - Other Promissory Note/Collections Case
- Insurance Coverage *(not provisionally complex)* (18)
  - Auto Subrogation
  - Other Coverage
- Other Contract (37)
  - Contractual Fraud
  - Other Contract Dispute

**Real Property**
- Eminent Domain/Inverse Condemnation (14)
- Wrongful Eviction (33)
- Other Real Property (e.g., quiet title) (26)
  - Writ of Possession of Real Property
  - Mortgage Foreclosure
  - Quiet Title
  - Other Real Property *(not eminent domain, landlord/tenant, or foreclosure)*

**Unlawful Detainer**
- Commercial (31)
- Residential (32)
- Drugs (38) *(if the case involves illegal drugs, check this item; otherwise, report as Commercial or Residential)*

**Judicial Review**
- Asset Forfeiture (05)
- Petition Re: Arbitration Award (11)
- Writ of Mandate (02)
  - Writ–Administrative Mandamus
  - Writ–Mandamus on Limited Court Case Matter
  - Writ–Other Limited Court Case Review
- Other Judicial Review (39)
  - Review of Health Officer Order
  - Notice of Appeal–Labor Commissioner Appeals

**Provisionally Complex Civil Litigation (Cal. Rules of Court Rules 3.400–3.403)**
- Antitrust/Trade Regulation (03)
- Construction Defect (10)
- Claims Involving Mass Tort (40)
- Securities Litigation (28)
- Environmental/Toxic Tort (30)
- Insurance Coverage Claims *(arising from provisionally complex case type listed above)* (41)

**Enforcement of Judgment**
- Enforcement of Judgment (20)
  - Abstract of Judgment (Out of County)
  - Confession of Judgment *(non-domestic relations)*
  - Sister State Judgment
  - Administrative Agency Award *(not unpaid taxes)*
  - Petition/Certification of Entry of Judgment on Unpaid Taxes
  - Other Enforcement of Judgment Case

**Miscellaneous Civil Complaint**
- RICO (27)
- Other Complaint *(not specified above)* (42)
  - Declaratory Relief Only
  - Injunctive Relief Only *(non-harassment)*
  - Mechanics Lien
  - Other Commercial Complaint Case *(non-tort/non-complex)*
  - Other Civil Complaint *(non-tort/non-complex)*

**Miscellaneous Civil Petition**
- Partnership and Corporate Governance (21)
- Other Petition *(not specified above)* (43)
  - Civil Harassment
  - Workplace Violence
  - Elder/Dependent Adult Abuse
  - Election Contest
  - Petition for Name Change
  - Petition for Relief From Late Claim
  - Other Civil Petition

**O'CONNOR & MIKHOV LLP**
Steve Mikhov (SBN 224676)
Lauren A. Ungs (SBN 273374)
1801 Century Park East, Suite 2300
Los Angeles, CA 90067
Telephone: (310) 552-2250
Fax: (310) 552-7973
Email: laurenu@omlawllp.com

Attorneys for Plaintiffs,
PETER PETROPOULOS and
CONNIE NELSON

ELECTRONICALLY FILED
Superior Court of California,
County of San Diego
**03/30/2016** at 11:58:52 AM
Clerk of the Superior Court
By Jessica Pascual,Deputy Clerk

**SUPERIOR COURT OF CALIFORNIA**
**COUNTY OF SAN DIEGO**

**PETER PETROPOULOS and CONNIE NELSON,**

Plaintiffs,

vs.

**FCA US LLC, a Delaware Limited Liability Company; PECK JEEP EAGLE, INC., a California Corporation dba MIDWAY JEEP CHRYSLER; and DOES 1 through 10, inclusive,**

Defendants.

Case No.: 37-2016-00010501-CU-BC-CTL

Unlimited Jurisdiction

**COMPLAINT**

1. **BREACH OF EXPRESS WARRANTY – VIOLATION OF SONG-BEVERLY ACT**
2. **BREACH OF IMPLIED WARRANTY – VIOLATION OF SONG-BEVERLY ACT**
3. **FRAUDULENT INDUCEMENT – CONCEALMENT**
4. **NEGLIGENT REPAIR**

Plaintiffs, PETER PETROPOULOS and CONNIE NELSON ("Plaintiffs"), allege as follows against Defendants, FCA US LLC, a Delaware Limited Liability Company, ("FCA US

LLC"), PECK JEEP EAGLE, INC., a California Corporation dba MIDWAY JEEP CHRYSLER ("PECK JEEP EAGLE") and DOES 1 through 10 inclusive, on information and belief, formed after an inquiry reasonable under the circumstances:

## GENERAL ALLEGATIONS

1. Plaintiffs, PETER PETROPOULOS and CONNIE NELSON are individuals residing in the City of San Diego, County of San Diego, and State of California.

2. Defendant FCA US LLC is and at all relevant times was a Delaware Limited Liability Company registered to do business in the State of California with its registered office in the City of Los Angeles, County of Los Angeles, and State of California.

3. Defendant PECK JEEP EAGLE is and at all relevant times was a California Corporation registered to do business in the State of California with its principal place of business in the City of San Diego, County of San Diego, and State of California

4. This cause of action arises out of the warranty obligations of FCA US LLC for a vehicle purchased by Plaintiffs from FCA US LLC and for which FCA US LLC issued a written warranty. Plaintiffs also allege that FCA US LLC concealed a known defect from Plaintiffs. The defective component is called the totally integrated power module (or "TIPM"). The TIPM consists of a computer, fuses, and internal relays, and is responsible for controlling and distributing electrical power to the entire vehicle – everything from steering and brakes, to the alarm, headlights, and the fuel pump.

5. Plaintiffs do not know the true names and capacities, whether corporate, partnership, associate, individual or otherwise of Defendant issued herein as Does 1 through 10, inclusive, under the provisions of section 474 of the California Code of Civil Procedure. Defendant Does 1 through 10, inclusive, are in some manner responsible for the acts, occurrences and transactions set forth herein, and are legally liable to Plaintiffs. Plaintiffs will seek leave to amend this Complaint to set forth the true names and capacities of the fictitiously named Defendant, together with appropriate charging allegations, when ascertained.

6. All acts of corporate employees as alleged were authorized or ratified by an officer, director or managing agent of the corporate employer.

7. Each Defendant whether actually or fictitiously named herein, was the principal, agent (actual or ostensible), or employee of each other Defendant and in acting as such principal or within the course and scope of such employment or agency, took some part in the acts and omissions hereinafter set forth by reason of which each Defendant is liable to Plaintiffs for the relief prayed for herein.

8. On or around March 6, 2011, Plaintiffs purchased a new 2011 Dodge Durango, VIN: 1D4RD4GGXBC598124, ("the Subject Vehicle"). The sales contract is attached and incorporated by its reference as Exhibit 1.

9. The Subject Vehicle was delivered to Plaintiff with serious defects and nonconformities to warranty and developed other serious defects and nonconformities to warranty including, but not limited to, multiple recalls, as well as engine, electrical, and HVAC defects.

**The Totally Integrated Power Module (TIPM) Defect**

10. The Subject Vehicle was factory-equipped with a Totally Integrated Power Module ("TIPM") which is located under the hood in the vehicle engine compartment. FCA US LLC equipped the Subject Vehicle with a TIPM that FCA US LLC refers to as the "TIPM 7."

11. The TIPM is the chief component in the Subject Vehicle's power distribution systems and consists of a computer, relays, fuses, and controls. The TIPM provides the primary means of voltage distribution and protection for the entire vehicle and FCA US LLC acknowledges that the TIPM is intended to provide safe, reliable, and centralized distribution of power to the Subject Vehicle's electrical systems.

12. The electrical systems that receive power distributed by the TIPM include the vehicles' safety systems, security system, ignition system, fuel system, electrical powertrain, and the vehicles' comfort and convenience systems. These systems control components including the air bags, fuel pump, windshield wipers, headlights, taillights, turn signals, and power windows and doors.

13. The TIPM installed in the Subject Vehicle is defective and thus fails to reliably control and distribute power to various vehicle electrical systems and component parts.

14. As a result of the TIPM defect, the Subject Vehicle has experienced:

a. Non-starting;
b. Multiple TIPM replacements;
c. HVAC malfunctions;
d. Complete power loss; and
e. Multiple TIPM related recalls.

15. The TIPM in the Subject Vehicle is likely to cause a variety of electrical issues such as a loss of headlight function, and unexpected distractions, such as the vehicle's horn or alarm sounding while on a roadway, which may each increase the risk of injury for the driver, passengers, or others on the roadway. The defective TIPM imposes a substantial safety risk to the operator of the vehicle and surrounding drivers.

16. FCA US LLC has instructed employees in multiple divisions to investigate the TIPM defect. As recently as spring 2012, teams were investigating vehicles equipped with the TIPM-7 not starting, having difficulty starting, and stalling, attributed to a malfunctioning fuel pump relay integral to the TIPM printed circuit board.

**FCA US LLC's Knowledge of the TIPM Defect**

17. FCA US LLC had superior and exclusive knowledge of the TIPM defects, and knew or should have known that the defects were not known by or reasonably discoverable by Plaintiffs before Plaintiffs purchased or leased the Subject Vehicle.

18. FCA US LLC's knowledge of the TIPM-7 defects since at least 2007 is demonstrated by the numerous consumer complaints submitted to FCA US LLC and to NHTSA, multiple TIPM-related recalls and technical service bulletins, two NHTSA investigations into TIPM-related complaints, FCA US LLC's exhaustive pre-release vehicle testing, and FCA US LLC's exclusive access to post-sale data about the performance of and repairs made to its vehicles. The use of limited recalls and TSBs as stop-gap measures demonstrates a pattern of concealment and improper denial of the TIPM defect by FCA US LLC.

19. FCA US LLC vehicles have been plagued with severe TIPM problems for the past

decade. As a result, FCA US LLC has initiated multiple TIPM-related recalls to address safety or emissions concerns.

20. An automotive manufacturer service bulletin typically takes time to develop and issue because the manufacturer needs to identify and understand the problem, develop and test the new repair instructions, and draft and finalize the bulletin before distributing it to dealerships.

21. The defect is so widespread that TIPM 7 replacement parts have often been on national backorder, with drivers reporting from 2011 to 2014 that they had to wait weeks or months to have their TIPMs replaced. In the meantime, FCA US LLC dealerships and auto-technicians are advising many drivers not to drive their vehicles until the TIPM is replaced, due to safety risks.

*NHTSA Recall 05V-461*

*(Defective TIPM-6 Causing Vehicles to Roll Away Without Warning)*

22. In October 2005, FCA US LLC recalled model year ("MY") 2006 Dodge Ram 1500 4x4 vehicles to reprogram (i.e., "flash") the TIPM-6 with new software to cure a safety-related defect.

23. The defect was that the TIPM-6 could have incorrect transfer case calibration set points. As a consequence, the transfer case could shift into neutral without warning and, if the parking brake were not engaged, the vehicle could roll away.

24. FCA US LLC admitted that because of the defect, "the vehicle could roll away with the transmission in the Park position and cause a crash without warning."

25. This defect shows that FCA US LLC was aware of the dangerous, life-threatening consequences of a defective TIPM. Yet, despite this knowledge, FCA US LLC manufactured the next generation TIPM, the TIMP-7, without resolving the module's propensity to cause life-threatening crashes.

*NHTSA Investigation PE07-027 / NHTSA Recall 07V-291*

*(Defective TIPM Causing Engine Stalling)*

26. In May 2007, NHTSA's Office of Defect Investigation ("ODI") opened Preliminary

Evaluation PE07-027.

27. The ODI had received 53 consumer complaints alleging incidents of engine stalling in MY 2007 Jeep Wrangler vehicles, prompting the evaluation. Most of the stalls occurred suddenly, and in 12 of them a loss of electrical power causing a loss of vehicle lighting coincided with the stalls.

28. The purpose of NHTSA's evaluation was to assess the frequency, scope, and safety consequences of the defect in the subject vehicles.

29. The ODI agreed to close the evaluation when, on July 3, 2007, FCA US LLC agreed to recall approximately 80,894 MY 2007 Jeep Wrangler and MY 2007 Dodge Nitro vehicles (NHTSA Recall 07V-291).

30. To remedy the stalling problem, FCA US LLC agreed to reprogram the TIPM in the subject vehicles with revised software. FCA US LLC admitted that there was an "issue" with the TIPM "that could result in an engine stall while driving," which could "cause a crash without warning."

31. At the time the evaluation as closed, the ODI had received 230 consumer complaints, two of which involved crashes and injuries. FCA US LLC had directly received 279 complaints by this time.

32. This recall did not cure all of the TIPM defects in the 2007 Dodge Nitro, as demonstrated by the fact that the 2007 Dodge Nitro was recalled again in November 2009 for a safety defect concerning TIPM-related windshield wiper problems.

33. Because the same TIPM was installed in the MY 2007 Dodge Nitro as in the Subject Vehicle, this recall demonstrates FCA US LLC's knowledge of the defective TIPM in the Subject Vehicle.

34. This recall did not resolve the stalling problems caused by the faulty TIPM, as demonstrated by a consumer complaint submitted to NHTSA on February 7, 2008 in which the complainant describes stalling in a MY 2007 Jeep Wrangler *after* having the recall repairs, and subsequently being told by a dealership service manager that the TIPM had to be replaced to cure the stalling problem (NHTSA ID No. 10217364, included in its entirety below.)

*Emissions Recall 2007-15-E (G23)*

*(Drivability Concerns Resulting from TIPM-7)*

35. In June 2007, FCA US LLC released an emission recall on certain vehicles equipped with the TIPM-7. The recall was conducted to reprogram the vehicles' TIPM to prevent a condition where during some trips the vehicles would have only a single forward gear ratio available. FCA US LLC admitted that "[b]oth emissions and drivability would be affected when vehicle is stick in one forward gear."

*Technical Service Bulletin 08-018-08*

*(Defective TIPM Causing Inability to Record Data)*

36. In May 2008, FCA US LLC distributed TSB 08-018-08 to its nationwide network of authorized dealers and service providers.

37. This TSB is not publicly available, either in summary form or in its entirety, because neither FCA US LLC nor NHTSA classified the TIPM defect addressed in the TSB as a *safety defect*.

38. The TSB covered several 2008 MY vehicles equipped with a TIPM-7.

39. The TIPM defect purportedly resolved by this TSB involved data recording – specifically, the inability to record data because of TIPM software problems.

40. The TSB states that "[d]ata recording is a valuable tool that provides assistance in diagnosing difficult to duplicate customer concerns. Some of the[se] models... were incapable of utilizing the data recording features due to software compatibility concerns within the TIPM." In other words, FCA US LLC admitted internally that owners and lessees of these vehicles would suffer mechanical problems with their vehicles, take the vehicles in for repair, and be told that the onboard computer did not show that any mechanical "event" or "problem" had occurred. Any reasonable consumer who has taken her car in for repairs would view this as a maddening scenario.

41. It is troubling that this TIPM defect has not been classified as a safety defect. Although the failure to record data itself does not appear to cause a loss of vehicle control and is probably

unnoticed by the driver, the failure to record real-time data could fail to record the manifestation of a safety defect, such as stalling, that would present a life-threatening safety hazard. FCA US LLC's, as well as consumers', ability to detect the manifestation of a safety defect was severely compromised by the inability to record data caused by the defective TIPM.

42. Because the TIPM installed in these vehicles is the same as in the Subject Vehicle, FCA US LLC was aware – yet again – that the TIPM installed in the Subject Vehicle was defective, and chose a stop-gap remedy on a limited set of vehicles.

43. Because the TSB was not publicly available, owners and lessees of these vehicles were unaware of the issue and many of them likely did not obtain the TIPM repair described in the TSB.

44. By proceeding with a non-public TSB instead of a publicly-announced safety recall, FCA US LLC chose to remain willfully blind about the manifestation of safety defects that a properly functioning TIPM would have enabled the data recorder to record.

45. Rather than disclose the TIPM problem and offer an adequate solution, FCA US LLC attempted to conceal it by advising its network of authorized dealers and service providers to update and/or flash the TIPM instead of replacing it.

*NHTSA Recall 09V-438*

*(Defective TIPM Windshield Wiper Relays Increasing Risk of a Crash)*

46. In November 2009, FCA US LLC notified NHTSA of a safety defect affecting the windshield wiper system on certain vehicles equipped with the TIPM-7.

47. The TIPM was defective in that a relay controlling the wipers could short out, causing the wipers to fail, in turn causing impaired driver visibility increasing the risk of a crash.

48. FCA US LLC recalled 84,680 vehicles to reprogram the TIPM.

49. Because the TIPM in the vehicles subject to this recall and in the Subject Vehicle is the same, this recall demonstrates that FCA US LLC knew, at the time that Plaintiffs purchased or leased the Subject Vehicle, that the TIPM was defective.

*Technical Service Bulletin 08-053-11*

*(Defective TIPM Causing Failure to Start and Intermittent Alarm Sound)*

50. In August 2011, FCA US LLC distributed TSB 08-053-11 to its nationwide network of authorized dealers and service providers.

51. This TSB is not publicly available, either in summary form or in its entirety, because neither FCA US LLC nor NHTSA have classified the TIPM defect addressed in the TSB as a safety defect.

52. This TSB covered numerous vehicles equipped with the TIPM-7.

53. The TIPM was defective in that the vehicle theft alarm would intermittently sound for no apparent reason and the vehicles would fail to start.

54. The TSB's purported fix was to flash reprogram the TIPM with new software.

55. It is troubling that this TIPM defect has not been classified as a safety defect. If a vehicle alarm sounds during regular operation of the vehicle, it could be so jarring and distracting as to cause the driver to lose control of the vehicle. Once again, FCA US LLC chose to address this problem internally rather than conduct a safety recall which would have alerted its customers, NHTSA, and the public to the ongoing, repeated safety problems with the TIPM.

56. Because the TIPM installed in these vehicles is the same as in the Subject Vehicle, FCA US LLC was aware—once again—that the TIPM installed in the Subject Vehicle was defective, and again chose an inadequate stop-gap remedy on a limited set of vehicles.

57. Rather than disclose the TIPM problem and offer an adequate solution, FCA US LLC attempted to conceal it by advising its network of authorized dealers and service providers to update and/or flash the TIPM instead of replacing it.

*NHTSA Recall 13V-282*

*(Defective TIPM Causing Non-Deployment of Active Head Restraints)*

58. In July 2013, FCA US LLC initiated yet another TIPM-related safety recall. FCA US LLC notified NHTSA that the airbag warning lamp would incorrectly illuminate due to an electrical overstress condition within the Occupant Restraint Controller Module ("ORCM"),

which would in turn cause the active head restraints to not deploy in certain rear-impact collisions, thereby increasing the risk of injury to a front seat occupant.

59. FCA US LLC recalled approximately 442,481 vehicles to flash the TIPM or replace the ORCM, as required. The TIPM was flash reprogrammed in certain vehicles equipped with the TIPM-7.

60. Once again, this recall evidences FCA US LLC's knowledge of the defective TIPM and shows FCA US LLC's repeated attempts to employ inadequate piecemeal remedies on the Subject Vehicle.

*Center for Auto Safety Submits Defect Petition to NHTSA*

61. On August 21, 2014, the Center for Auto Safety ("CAS") submitted a defect petition to NHTSA, requesting that NHTSA "initiate a safety defect investigation into failures associated with the [TIPM] installed in FCA US LLC SUVs, trucks, and vans beginning in the 2007 model year." The petition noted that TIPM failures result in a variety of safety-related problems, "many of which have the potential for destructive results," such as stalling, airbag non-deployment, failure of fuel-pump shutoff, and vehicle fires.

62. CAS had received at least 70 complaints related to the TIPM in FCA US LLC vehicles, and a stall/no-start condition was the most reported outcome of TIPM failure. Seventeen of these complaints report engine stalling and 34 report a failure to start. Two of them report smoke and one reports a vehicle fire.

63. The CAS petition asserts that FCA US LLC's previous TIPM-related recalls were insufficient "to address the TIPM problem widespread throughout FCA US LLC's fleet, instead focusing on a highly limited set of vehicles and circumstances."

64. Plaintiffs have suffered the consequences of the TIPM failure described by CAS, and Plaintiffs agree with CAS's characterization of the TIPM problem as widespread throughout FCA US LLC's fleet and in the Subject Vehicle.

///

///

*NHTSA Recall 14V-530*

*(Failure of Fuel Pump Relay Within the TIPM)*

65. On September 3, 2014, FCA US LLC notified NHTSA of yet another TIPM-related safety defect. This time, the fuel pump relay within the TIPM could fail, causing stalling without warning or failure to start. In FCA US LLC's words, "[t]he vehicle may intermittently or permanently: not start, not start the first time, not stay running upon start, stall, or the fuel pump may stay energized upon vehicle shutdown," and "[a]n intermittent or failed fuel pump relay could cause the engine to stall while driving and cause a crash without a warning."

66. The remedy under the recall was to install a new fuel pump relay external to the TIPM. FCA US LLC may have decided that resolving the problem within the TIPM was not feasible, given the extensive defects and problems within the TIPM.

67. The recall covered 188,723 vehicles equipped with the TIPM-7.

68. Yet again, this recall demonstrates FCA US LLC's knowledge that the TIPM in the Subject Vehicle was defective. And again, FCA US LLC chose to implement an inadequate piecemeal remedy.

*NHTSA Agrees to Evaluate the CAS Defect Petition*

69. On September 8, 2014, the CAS supplemented its defect petition with additional consumer complaints about the TIPM. In the supplement, the CAS identified 24 crashes from NHTSA's Early Warning Reporting ("EWR") database that the CAS believes may be related to TIPM failure. Crash reports in the EWR database are submitted by the vehicle manufacturer, demonstrating FCA US LLC's awareness of these crashes.

70. On September 25, 2014, NHTSA's ODI opened Investigation DP14-004 to evaluate the CAS's defect petition. The investigation will "review allegations of [TIPM] failures resulting in engine stall while driving, airbag non-deployment incidents, unintended acceleration and/or vehicle fire in certain . . . vehicles . . . equipped with TIPM-7 modules and manufactured by FCA US LLC Group LLC[.]"

71. The ODI investigation covers approximately 4,800,000 vehicles equipped with the

TIPM-7.

72. On September 30, 2014, the CAS submitted another supplement to its defect petition, including approximately 25 new consumer complaints about the TIPM that it had received.

73. With CAS's submission of its defect petition and supplements, and NHTSA's opening of the investigation, FCA US LLC is aware of all of the TIPM-related complaints made to the CAS. This is in addition to all of the TIPM-related complaints made to NHTSA about which FCA US LLC is, and has been, aware. At the very least, FCA US LLC has constructive knowledge of the consumer complaints submitted to NHTSA, which are publically available on the NHTSA website.

74. In response to a request for information by NHTSA, FCA US LLC stated the following in a December 12, 2014 letter to NHTSA:

a. FCA US LLC had identified 709 reports which relate or may relate to the TIPM in the subject vehicles, representing 199 unique vehicle identification numbers ("VINs").

b. FCA US LLC had identified 605 consumer complaints, made to FCA US LLC, which relate or may related to the TIPM in the subject vehicles, representing 189 unique VINs. FCA US LLC did not specify when it received these complaints.

c. FCA US LLC had identified 104 Field Reports which relate or may relate to the TIPM in the subject vehicles, representing 65 unique VINs. FCA US LLC did not specify when it performed these field reports.

d. FCA US LLC had identified 207 paid warranty claims related to repair or replacement of the TIPM-7 module, representing 126 unique VINs.

75. In 2013, FCA US LLC conducted a safety recall of 2011 and 2012 model year Dodge Nitro and Jeep Liberty vehicles, through which it would "flash" the vehicles' TIPM. The recall was prompted by the fact that the vehicles could experience illuminated airbag warning lamps and restraints not deploying in collisions.

76. In that letter, FCA US LLC stated also that it had identified zero reports of crash, fire, injury, or fatality which relates or may relate to the TIPM in the subject vehicles. However, by

the date of that letter consumers had submitted to NHTSA at least six reports describing crashes or fires in the relevant vehicles, rendering FCA US LLC's statement erroneous if not intentionally misrepresentative:

a. On September 7, 2013, a consumer reported that "the TIPM fuse exploded" in a MY 2011 Jeep Grand Cherokee (NHTSA ID No. 10542447).

b. On March 19, 2014, a consumer reported that the "wires and TIPM started melting and smoking and burned" in a MY 2012 Dodge Ram 5500 (NHTSA ID No. 10573426).

c. On March 19, 2014, a consumer reported that the TIPM in a MY 2012 Dodge Ram 5500 had caught fire for the second time in a week and that the consumer had taken the truck to a dealership after the first fire (NHTSA ID No. 10573471).

d. On June 5, 2014, a consumer reported that a five-car pileup occurred immediately behind her because she stalled in the middle of the road due to a faulty TIPM in a MY 2011 Dodge Durango (NHTSA ID No. 10596370).

e. On September 18, 2014, a consumer reported that her MY 2011 Durango was "smoking" and that a dealership diagnosed the problem as an electrical short in the TIPM (NHTSA ID No. 10637171).

f. On October 30, 2014, a consumer reported a crash caused by a stall in a MY 2008 Jeep Wrangler (NHTSA ID No. 10651411).

*Consumer Complaints to NHTSA*

77. FCA US LLC has knowledge of the fact that the defective TIPMs installed in the Subject Vehicle is prone to sudden failure because of the numerous complaints that consumers have made to NHTSA.

78. Owners of vehicles equipped with a TIPM-7 have submitted at least 240 complaints to NHTSA about electrical problems including stalling, headlights turning off, and failure to start—most, if not all, of which occurred with no warning whatsoever to the driver.

79. By the end of 2011, consumers had submitted over 100 complaints about the TIPM to

NHTSA.

80. Some of these complaints describe dangerous situations, indicating that FCA US LLC is putting the lives of consumers and their passengers at risk. When a defective TIPM suddenly fails without warning, a driver loses the ability to safely operate their vehicle.

81. Many of the complaints to NHTSA were made prior to the sale of the Subject Vehicle to Plaintiffs.

82. For years, FCA US LLC has monitored drivers' safety-related reports to the NHTSA, which can be viewed on the NHTSA's website. There are several hundred complaints on the NHTSA website and elsewhere online dating back to when the TIPM 7 was first introduced in 2007 model year FCA US LLC vehicles.

83. As early as 2008, drivers of vehicles equipped with the TIPM 7 started contacting the NHTSA to complain that their vehicles were experiencing a host of electrical issues, including uncontrollable activity of the windshield wipers, horn, and alarm system, and the headlights and taillights not working. Drivers also complained that their vehicles would not start and that the vehicles would stall without warning. By the end of 2011, over 100 drivers had complained to the NHTSA that they had experienced some combination of these symptoms, and dealers were diagnosing the problems as stemming from a defective TIPM, with some dealers saying the TIPM was already on a nationwide backorder.

*Pre-Release Testing Data*

84. FCA US LLC's knowledge of the TIPM defect is also demonstrated by the fact that FCA US LLC studied and tracked TIPM-related issues through exhaustive pre-release testing. In recent years, FCA US LLC has tested models for millions of miles before their release. For example, FCA US LLC employees put seven million miles on multiple 2011 Jeep Grand Cherokee test vehicles before production. Given the speed and frequency with which the TIPM defect manifests, it is not plausible that this testing would not have alerted FCA US LLC to the existence of the TIPM defect. Only FCA US LLC, however, has access to its pre-release testing data.

85. FCA US LLC also receives data about how its vehicles are performing in the days, weeks, and months after they are sold. FCA US LLC collects information from both drivers and dealerships, including through complaints, warranty claims, replacement parts data, and other aggregated data sources. FCA US LLC has exclusive access to this information also.

86. FCA US LLC is collecting old TIPM parts that have been replaced, in an effort to keep those parts away from public scrutiny. FCA US LLC is requiring anyone who wants to purchase a new TIPM from FCA US LLC to agree to return to FCA US LLC the old TIPM that is being replaced. This requirement affects non-FCA US LLC mechanics and private individuals who seek to keep the original TIPM parts for any reason, including but not limited to examining those parts for defects. In addition, the owners of these vehicles already have paid for the original TIPM parts, and should not have to give up their personal property in order to buy a replacement part; this amounts to an abusive tactic.

87. Notwithstanding the history of TIPM problems in its vehicles, FCA US LLC chose to begin installing the TIPM 7 in 2007 model year vehicles and continued to install the TIPM 7 into vehicles through the 2014 model year.

88. Given the repeated, severe problems that plagued the TIPM in its vehicles, FCA US LLC understood that the TIPMs posed a heightened risk of problems for consumers and FCA US LLC was particularly aware of and on the lookout for early indicia of TIPM problems.

**FCA US LLC's Failure to Disclose the TIPM Defect**

89. FCA US LLC has never disclosed the TIPM defect to Plaintiffs prior to the purchase of the Subject Vehicle or at any point during ownership of the Subject Vehicle, and FCA US LLC has never instructed its dealerships to disclose the TIPM defect to drivers or potential purchasers or lessees of vehicles equipped with the TIPM-7.

90. The TIPM defect was not known or reasonably discoverable by the Plaintiffs before purchase or lease, or without experiencing the defect first hand and exposing themselves to an unreasonable safety risk.

91. FCA US LLC has remained silent even as it issued a service bulletin, conducted internal

investigations, and saw the TIPM replacement parts go on national backorder and hundreds of complaints for effected vehicles were lodged with the NHTSA.

92. FCA US LLC's refusal to publically acknowledge the defect has created widespread confusion. FCA US LLC's failure to notify consumers, dealerships, or auto-technicians prevents the TIPM problem from being efficiently diagnosed. Drivers often do not realize that the symptoms they are experiencing are due to the TIPM defect or that prompt action is needed to ensure they do not experience stalling, headlight loss, or other dangerous symptoms in the future. Likewise, the lack of information makes it less likely that dealerships and auto-technicians will be able to diagnose and fix the TIPM defect, or advise Plaintiffs about the dangers of driving the Subject Vehicle.

93. As a result of FCA US LLC's inaction and silence, Plaintiffs were entirely unaware that Plaintiffs purchased, and continues to drive, unsafe and unreliable vehicles. As FCA US LLC knows, a reasonable person would consider the TIPM defect important and would not purchase or lease a vehicle equipped with the TIPM defect were the defect disclosed in advance, or would pay substantially less for the vehicle.

**PLAINTIFFS' EXPERIENCES**

94. On or around August 30, 2012, Plaintiffs delivered the Subject Vehicle to an authorized FCA US LLC repair facility for repair. Plaintiffs complained that the Subject Vehicle was difficult to start. Upon return of the Subject Vehicle, the service manager at the authorized repair facility notified Plaintiffs that the vehicle had been repaired. Plaintiffs reasonably relied on this representation by the manager of the expert repair technicians.

95. On or around September 17, 2012, Plaintiffs delivered the Subject Vehicle to an authorized FCA US LLC repair facility for repair. Plaintiffs again complained that the Subject Vehicle was difficult to start and was intermittently stalling. During this visit the TIPM was replaced. The Subject Vehicle was not returned to Plaintiffs until sometime on or after September 24, 2012. Upon return of the Subject Vehicle, each time the service manager at the authorized repair facility notified Plaintiffs that the vehicle had been repaired. Plaintiffs

reasonably relied on this representation by the manager of the expert repair technicians.

96. On or around October 30, 2012, Plaintiffs delivered the Subject Vehicle to an authorized FCA US LLC repair facility for repair. Plaintiffs complained that the Subject Vehicle's HVAC system was malfunctioning. The Subject Vehicle was not returned to Plaintiffs until sometime on or after November 8, 2012. Upon return of the Subject Vehicle, the service manager at the authorized repair facility notified Plaintiffs that the vehicle had been repaired. Plaintiffs reasonably relied on this representation by the manager of the expert repair technicians.

97. On or around May 1, 2013, Plaintiffs again delivered the Subject Vehicle to an authorized FCA US LLC repair facility for repairs because the Subject Vehicle would not start. The Subject Vehicle was not returned to Plaintiffs until sometime on or after May 7, 2013. Upon return of the Subject Vehicle, the service manager at the authorized repair facility notified Plaintiffs that the vehicle had been repaired. Plaintiffs reasonably relied on this representation by the manager of the expert repair technicians.

98. On or around May 10, 2013, Plaintiffs again delivered the Subject Vehicle to an authorized FCA US LLC repair facility for repairs because the Subject Vehicle would not start. The Subject Vehicle was not returned to Plaintiffs until sometime on or after May 12, 2013. Upon return of the Subject Vehicle, the service manager at the authorized repair facility notified Plaintiffs that the vehicle had been repaired. Plaintiffs reasonably relied on this representation by the manager of the expert repair technicians.

99. On or around December 27, 2013, Plaintiffs again delivered the Subject Vehicle to an authorized FCA US LLC repair facility for repairs because the Subject Vehicle would not start. Upon return of the Subject Vehicle, the service manager at the authorized repair facility notified Plaintiffs that the vehicle had been repaired. Plaintiffs reasonably relied on this representation by the manager of the expert repair technicians.

100. On or around July 10, 2014, Plaintiffs again delivered the Subject Vehicle to an authorized FCA US LLC repair facility for repairs. Plaintiff complained that the check engine light was on. Upon return of the Subject Vehicle, the service manager at the authorized repair facility notified Plaintiffs that the vehicle had been repaired. Plaintiffs reasonably relied on this

representation by the manager of the expert repair technicians.

101. On or around July 25, 2014, Plaintiffs again delivered the Subject Vehicle to an authorized FCA US LLC repair facility for repairs because the check engine light was on. The Subject Vehicle was not returned to Plaintiffs until sometime on or after July 26, 2014. Upon return of the Subject Vehicle, the service manager at the authorized repair facility notified Plaintiffs that the vehicle had been repaired. Plaintiffs reasonably relied on this representation by the manager of the expert repair technicians.

102. On or around July 3, 2015, Plaintiffs delivered the Subject Vehicle to an authorized FCA US LLC repair facility for repairs. Plaintiffs complained that the Subject Vehicle suffered a complete power loss. In addition, while at the repair facility the Subject Vehicle underwent multiple recalls related to TIPM issues, including the replacement of the sun visor wiring, fuel pump relay, PCM and TIPM. The Subject Vehicle was not returned to Plaintiffs until sometime on or after July 9, 2015. Upon return of the Subject Vehicle, the service manager at the authorized repair facility notified Plaintiffs that the vehicle had been repaired. Plaintiffs reasonably relied on this representation by the manager of the expert repair technicians.

<u>All Statute of Limitations Periods are Tolled by the Discovery Rule and the Doctrine of Fraudulent Concealment</u>

103. FCA US LLC concealed the fact that the Subject Vehicle was equipped with a defective TIPM7. FCA US LLC also concealed the major safety concerns related to the likely failures of the TIPM7.

104. FCA US LLC continued to misrepresent its ability to repair the Subject Vehicle in conformity with the warranty throughout the warranty period.

105. At all relevant times, FCA US LLC was aware of the defects in the TIPM7.

106. As described in more detail above, as early as 2007, FCA US LLC began issuing significant technical service bulletins as the result of NHTSA investigations to its authorized dealers explaining the widespread issues with the TIPM7. At no point prior to the sale of the vehicle to Plaintiffs or during Plaintiffs' ownership of the Vehicle did FCA US LLC or an

authorized dealer ever inform Plaintiffs of the ongoing irreparable defect.

107. FCA US LLC had a duty to disclose the concealed facts alleged above because FCA US LLC knew that Plaintiffs did not know a material fact and further knew that such facts were not readily accessible to the Plaintiffs because FCA US LLC actively concealed those facts.

108. FCA US LLC had a duty to disclose the concealed facts alleged above because FCA US LLC was in a superior position of knowledge.

109. FCA US LLC had a duty to disclose the concealed facts alleged above because FCA US LLC actively concealed material facts in order to induce a false belief.

110. FCA US LLC intended for Plaintiffs to rely on those misrepresentations to conceal the fact that the defective TIPM7 could not be repaired.

111. Prior to the sale of the Subject Vehicle, and at all times thereafter, Defendant therefore failed to disclose the existence of the Subject Vehicle's inherent defects to Plaintiffs, and Defendant failed to disclose its inability to repair these inherent defects, which prevented the Subject Vehicle from conforming to its applicable warranties. In effect, after the sale of the Subject Vehicle, Defendant fraudulently concealed from purchasers, including Plaintiffs, the fact that the dealers were not properly repairing the defects to the TIPM7, and knew that the limited work that FCA US LLC had authorized its dealerships to perform on those vehicles would not properly repair them.

112. On or around October 2015, Plaintiffs received a letter in the mail from the settlement administrator in a class action lawsuit informing Plaintiffs that Plaintiffs were a member of a class of individuals for which a "class action settlement involving the Totally Integrated Power Module (TIPM)" had been reached. That letter discussed a recall related to the TIPM, reimbursement for past repairs related to the TIPM, and an extended warranty for a part effected by the TIPM. Specifically, the letter stated: "The [class action] lawsuit claims that the Totally Integrated Power Module (TIPM) installed in model-years 2011, 2012, and 2013 Dodge Durango and Jeep Grand Cherokee vehicles is defective and poses a safety hazard. Plaintiffs alleged that FCA US violated the law by failing to disclose the defect to consumers and that it should be required to repair the defect free of charge and reimburse consumers for the out-of-pocket

expenses." This was the earliest date that FCA US LLC made any attempt to notify Plaintiffs of any of the known defects in the TIPM7. This date was the earliest date that Plaintiffs could have had any sort of notice of the facts which give rise to Plaintiffs' fraud causes of action. FCA US LLC did not disclose any of this information prior to the sale of the Subject Vehicle to Plaintiffs or at any earlier date during ownership. Accordingly, Plaintiffs could not have discovered Plaintiffs' claims related to fraud prior to October 2015. Plaintiffs could not, through reasonable and diligent investigation, have discovered such on an earlier date because of FCA US LLC's fraudulent misrepresentations and concealment of the defects in the TIPM7 in Plaintiffs' Subject Vehicle, as previously alleged above, and because of the repeated false assurances of FCA US LLC and its service dealership agents made to Plaintiffs, on which Plaintiffs reasonably relied, that FCA US LLC had and would repair any problems with the transmission in Plaintiffs' Subject Vehicle that occurred during the express warranty period. The statute of limitations for each of Plaintiffs' claims against FCA US LLC was therefore tolled under the delayed discovery rule and the doctrine of fraudulent concealment until Plaintiffs could have first discovered on or around October 2015 that FCA US LLC had concealed the irreparable defects in the TIPM7.

113. Because FCA US LLC failed to disclose these foregoing facts to Plaintiffs, all statute of limitations periods with respect to sale of the Subject Vehicle were tolled by the doctrines of fraudulent concealment, the discovery rule, and/or equitable tolling. As alleged herein, FCA US LLC wrongfully concealed the fact (1) that the TIPM7 had a irreparable defect that posed significant safety risk to the drivers and the public; and (2) that its dealerships were making inadequate repairs that were incapable of addressing the root cause of the Subject Vehicle's malfunctions.

114. Plaintiffs did not discover the operative facts that are the basis of the claims alleged herein because the facts were concealed in confidential and privileged documents, which a consumer would not know about and could not obtain.

115. No amount of diligence by Plaintiffs could have led to the discovery of these facts because they were kept secret by FCA US LLC and, therefore, Plaintiffs were not at fault for failing to discover these facts.

116. Plaintiffs did not have actual knowledge of facts sufficient to put them on notice. Plaintiffs did not know, nor could have known, about FCA US LLC's inability to repair the defects in its TIPM7 because, as alleged above, FCA US LLC kept this information highly confidential, and its dealership assured Plaintiffs that its repairs were effective.

<u>All Statute of Limitations Periods are Tolled by the Tolling Doctrine Established in *American Pipe & Construction Co. v. Utah* (1974) 414 U.S. 538 As a Result of the Class Action *Velasco, et al v. Chrysler Group LLC*</u>

117. Plaintiffs gave timely notice of Plaintiffs' claims against FCA US LLC in the present action as putative class members in a class action, *Velasco, et al v. Chrysler Group LLC*, United States District Court, Central District of California, Case No. 2:13-cv-08080-DDP-VBK, which was filed on November 1, 2013. That action was filed within three years of the date of the alleged fraudulent act by FCA US LLC in the present action, as previously described in detail above.

118. There is no prejudice to FCA US LLC in gathering evidence to defend against Plaintiffs' individual claims because the class definition in the class action complaint within which Plaintiffs were putative class members and the allegations in the class action lawsuit, *Velasco, et al v. Chrysler Group LLC*, United States District Court, Central District of California, Case No. 2:13-cv-08080-DDP-VBK, put FCA US LLC on notice of the facts that give rise to Plaintiffs' individual action, the witnesses necessary for FCA US LLC to defend Plaintiffs' individual action, and the causes of action against FCA US LLC asserted in Plaintiffs' individual action.

119. *Velasco, et al v. Chrysler Group LLC*, United States District Court, Central District of California, Case No. 2:13-cv-08080-DDP-VBK alleged the same material facts on behalf of Plaintiffs as putative class members as are being alleged by Plaintiffs in the present individual action.

120. The facts alleged in *Velasco, et al v. Chrysler Group LLC*, United States District Court, Central District of California, Case No. 2:13-cv-08080-DDP-VBK are substantially

similar, if not identical to the facts alleged herein.

121. The allegations in *Velasco, et al v. Chrysler Group LLC*, United States District Court, Central District of California, Case No. 2:13-cv-08080-DDP-VBK are based on the same subject matter and similar evidence as the instant complaint. Those allegations concern the same evidence, memories, and witnesses as the subject matter in the instant complaint.

122. The *Velasco* class action certainly protected the efficiency and economy of litigation because that class action settled as to thousands of consumers nationwide through a single action. The *Velasco* class was certified and the final settlement was approved by the District Court, making the class action lawsuit an efficient means of pursuing such claims.

123. The tolling of Plaintiffs' individual statute of limitations encourages the protection of efficiency and economy in litigation as promoted by the class action device, so that putative class members would not find it necessary to seek to intervene or to join individually because of fear the class might never be certified or putative class members may subsequently seek to request exclusion.

124. The running of all statute of limitations on each of Plaintiffs' claims asserted against FCA US LLC in the present action were therefore tolled by *American-Pipe* tolling during the entire pendency of the *Velasco* class action (i.e., from the date on which the *Velasco* class action was filed on November 1, 2013 to the date on which Plaintiffs filed the instant action).

<u>All Statute of Limitations Periods are Tolled Under California Law by the Doctrine of Equitable Tolling As a Result of the Class Action *Velasco et al v. Chrysler Group LLC*</u>

125. Plaintiffs gave timely notice of Plaintiffs' claims against FCA US LLC in the present action as putative class members in a class action, *Velasco, et al v. Chrysler Group LLC*, United States District Court, Central District of California, Case No. 2:13-cv-08080-DDP-VBK, which was filed on November 1, 2013. That action was filed within three years of the date of the alleged fraudulent act by FCA US LLC in the present action, as previously described in detail above.

126. There is no prejudice to FCA US LLC in gathering evidence to defend against Plaintiffs' individual claims because the class definition in the class action complaint within which Plaintiffs were putative class members and the allegations in the class action lawsuit, *Velasco, et al v. Chrysler Group LLC*, United States District Court, Central District of California, Case No. 2:13-cv-08080-DDP-VBK, put FCA US LLC on notice of the facts that give rise to Plaintiffs' individual action, the witnesses necessary for FCA US LLC to defend Plaintiffs' individual action, and the causes of action against FCA US LLC asserted in Plaintiffs' individual action.

127. *Velasco, et al v. Chrysler Group LLC*, United States District Court, Central District of California, Case No. 2:13-cv-08080-DDP-VBK alleged the same material facts on behalf of Plaintiffs as putative class members as are being alleged by Plaintiffs in the present individual action.

128. The facts alleged in *Velasco, et al v. Chrysler Group LLC*, United States District Court, Central District of California, Case No. 2:13-cv-08080-DDP-VBK are substantially similar, if not identical to the facts alleged herein.

129. The allegations in *Velasco, et al v. Chrysler Group LLC*, United States District Court, Central District of California, Case No. 2:13-cv-08080-DDP-VBK are based on the same subject matter and similar evidence as the instant complaint. Those allegations concern the same evidence, memories, and witnesses as the subject matter in the instant complaint.

130. The *Velasco* class action certainly protected the efficiency and economy of litigation because that class action settled as to thousands of consumers nationwide through a single action. The *Velasco* class was certified and the final settlement was approved by the District Court, making the class action lawsuit an efficient means of pursuing such claims.

131. Plaintiffs acted reasonably and in good faith in filing the instant action. Shortly after discovering FCA US LLC's fraudulent behavior, Plaintiffs opted out of the class action settlement in *Velasco* and filed the instant action to pursue his individual rights without delay.

132. The tolling of Plaintiffs' individual statute of limitations encourages the protection of efficiency and economy in litigation as promoted by the class action devise, so that putative class

members would not find it necessary to seek to intervene or to join individually because of fear the class might never be certified or putative class members may subsequently seek to request exclusion.

133. The running of all statute of limitations on each of Plaintiffs' claims asserted against FCA US LLC in the present action were therefore tolled by *American-Pipe* tolling during the entire pendency of the *Velasco* class action (i.e., from the date on which the *Velasco* class action was filed on November 1, 2013 to the date on which Plaintiffs filed the instant action).

## FIRST CAUSE OF ACTION

**(Violation of the Song-Beverly Act – Breach of Express Warranty)**

**(Against Defendant FCA US LLC Only)**

134. Plaintiffs incorporate herein by reference each and every allegation contained in the preceding and succeeding paragraphs as though herein fully restated and re-alleged.

135. Express warranties accompanied the sale of the Subject Vehicle to Plaintiffs by which FCA US LLC undertook to preserve or maintain the utility or performance of Plaintiffs' Subject Vehicle or provide compensation if there was a failure in such utility or performance.

136. The Subject Vehicle was delivered to Plaintiffs with serious defects and nonconformities to warranty and developed other serious defects and nonconformities to warranty including, but not limited to a defective TIPM.

137. Pursuant to the Song-Beverly Consumer Warranty Act (herein after the "Act") Civil Code sections 1790 *et seq.* the Subject Vehicle constitutes "consumer goods" used primarily for family or household purposes, and Plaintiffs has used the Subject Vehicle primarily for those purposes.

138. Plaintiffs are a "buyer" of consumer goods under the Act.

139. Defendant FCA US LLC is a "manufacturer" and/or "distributor" under the Act.

140. The foregoing defects and nonconformities to warranty manifested themselves within the applicable express warranty period. The nonconformities substantially impair the use, value and/or safety of the Subject Vehicle.

141. Plaintiffs delivered the Subject Vehicle to an authorized FCA US LLC repair facility for repair of the nonconformities.

142. Defendant was unable to conform Plaintiffs' Subject Vehicle to the applicable express warranties after a reasonable number of repair attempts.

143. Notwithstanding Plaintiffs' entitlement, Defendant FCA US LLC has failed to either promptly replace the new motor vehicle or promptly make restitution in accordance with the Song-Beverly Act.

144. By failure of Defendant to remedy the defects as alleged above, or to issue a refund or replacement, Defendant is in breach of its obligations under the Song-Beverly Act.

145. Under the Act, Plaintiffs are entitled to reimbursement of the price paid for the Subject Vehicle less that amount directly attributable to use by the Plaintiffs prior to discovery of the nonconformities.

146. Plaintiffs are entitled to all incidental, consequential, and general damages resulting from Defendant's failure to comply with their obligations under the Song-Beverly Act.

147. Plaintiffs are entitled under the Song-Beverly Act to recover as part of the judgment a sum equal to the aggregate amount of costs and expenses, including attorney's fees, reasonably incurred in connection with the commencement and prosecution of this action.

148. Plaintiffs are entitled in addition to the amounts recovered, a civil penalty of up to two times the amount of actual damages in that FCA US LLC, has willfully failed to comply with its responsibilities under the Act.

**SECOND CAUSE OF ACTION**

**(Violation of the Song-Beverly Act – Breach of Implied Warranty)**

**(Against Defendant FCA US LLC Only)**

149. Plaintiffs incorporate herein by reference each and every allegation contained in the preceding and succeeding paragraphs as though herein fully restated and re-alleged.

150. FCA US LLC and its authorized dealership at which Plaintiffs purchased the Subject Vehicle had reason to know the purpose of the Subject Vehicle at the time of sale of the

Subject Vehicle. The sale of the Subject Vehicle was accompanied by an implied warranty of fitness.

151. The sale of the Subject Vehicle was accompanied by an implied warranty that the Subject Vehicle was merchantable pursuant to Civil Code section 1792.

152. The Subject Vehicle was not of the same quality as those generally acceptable in the trade because it was equipped with a defective TIPM.

153. The Subject Vehicle was not fit for the ordinary purpose for which such goods are used because it was equipped with a defective TIPM.

154. The Subject Vehicle did not measure up to the promises or facts stated on the container or label because it was equipped with a defective TIPM.

155. Plaintiffs are entitled to justifiably revoke acceptance of the Subject Vehicle under Civil Code section 1794, *et seq*; Plaintiffs hereby revoke acceptance of the Subject Vehicle.

156. Plaintiffs are entitled to replacement or reimbursement pursuant to Civil Code section 1794, *et seq.*

157. Plaintiffs are entitled to rescission of the contract pursuant to Civil Code section 1794, *et seq.* and Commercial Code section 2711.

158. Plaintiffs are entitled to recover any "cover" damages under Commercial Code sections 2711, 2712, and Civil Code section 1794, *et seq.*

159. Plaintiffs are entitled to recover all incidental and consequential damages pursuant to 1794 *et seq* and Commercial Code sections 2711, 2712, and 2713 *et seq.*

**THIRD CAUSE OF ACTION**

**(Fraudulent Inducement – Concealment)**

**(Against Defendant FCA US LLC Only)**

160. Plaintiffs incorporate herein by reference each and every allegation contained in the preceding and succeeding paragraphs as though herein fully restated and re-alleged.

161. FCA US LLC concealed a known defect from Plaintiffs. The defective component

is called the totally integrated power module (or TIPM). The TIPM consists of a computer, fuses, and internal relays, and is responsible for controlling and distributing electrical power to the entire vehicle—everything from steering and brakes, to the alarm, headlights, and the fuel pump.

162. Since the TIPM controls power to a wide variety of essential vehicle systems, including safety and security systems, the defect often leaves the vehicles incapable of providing reliable or safe transportation. This defect may cause a vehicle to fail to start (or take dozens of attempts before the engine will turn over) because of the defect, and vehicles start up at other times only to stall, sometimes while traveling at high speeds. The TIPM defect has caused headlights and taillights to suddenly shut off. It has also caused horns to honk, car alarms to sound, and windshield wipers to activate all on their own.

163. FCA US LLC intentionally failed to disclose the known TIPM defect, which was known only to it.

164. FCA US LLC concealed and suppressed material facts to boost confidence in its vehicles and falsely assure purchasers and lessors of its vehicles that FCA US LLC was a reputable manufacturer that stands behind its vehicles after they are sold and that its vehicles are safe and reliable.

165. FCA US LLC's deceptive omissions infected all purchases and leases of vehicles equipped with the TIPM-7, regardless of whether the vehicles were used or new at the time of acquisition. As early as 2007, FCA US LLC knew of the TIPM defects. FCA US LLC had ample opportunity to communicate to the public, its dealerships, and government regulators in a fashion that would have informed the car-buying public about the TIPM defects in vehicles equipped with the TIMP-7. For example, FCA US LLC could have recalled the vehicles. Plaintiffs reasonably, justifiably, and detrimentally relied on FCA US LLC's silence about the TIPM defect when deciding whether to purchase or lease a vehicle equipped with a TIPM-7, in part because FCA US LLC was, and still is, in a position of superior knowledge about the TIPM defects. Plaintiffs reasonably trusted that FCA US LLC would not sell a dangerously defective vehicle or fail to recall those vehicles – or otherwise make widely known that the vehicles were dangerously defective such that current and prospective owners and lessees could make informed

decisions to protect themselves and their families.

166. FCA US LLC acted with malice and a willful and conscious disregard for the rights and safety of the Plaintiffs and the public in committing these fraudulent acts.

167. FCA US LLC had, and still has, a duty to disclose the TIPM defects because they were known and/or accessible only the FCA US LLC, which had superior knowledge and access to the relevant facts, and because FCA US LLC knew that the relevant facts were not known or reasonably discoverable by Plaintiffs.

168. Under the National Traffic and Motor Vehicle Safety Act (the "Safety Act"), 49 U.S.C. §§ 30101-30183, FCA US LLC had the duty to disclose the TIPM defects to NHTSA, and by extension and implication to the public. *Id.* § 30118(c). If FCA US LLC had disclosed the TIPM defects to NHTSA, NHTSA would have made that information public on its websites (www.safecar.gov and www.nhtsa.dot.gov) and its automobile safety telephone hotline.

169. FCA US LLC still has not made full and adequate disclosure and continues to defraud Plaintiffs by concealing material information regarding the TIPM defects that exist in the Vehicle and the risks posed by those defects.

170. FCA US LLC actively concealed and/or suppressed these material facts, in whole or in part, to protect its profits and avoid recalls that would have hurt the brand's image and cost FCA US LLC money, and it did so at the expense of Plaintiffs.

171. Because FCA US LLC knew that any reasonable consumer would not purchase a vehicle with a defective TIPM, or would pay only substantially less for that vehicle, and FCA US LLC was concealing material information about the TIPM defects, FCA US LLC must have known that Plaintiffs were acting on the basis of mistaken knowledge that their vehicles were safe and reliable when they decided to purchase or lease them at market price (without a discount to reflect that they contained a defective TIPM).

172. Plaintiffs could not have discovered the TIPM defect because FCA US LLC kept all testing information confidential.

173. That FCA US LLC actively concealed an important fact from Plaintiffs or prevented him from discovering that fact.

174. Plaintiffs did not know about the TIPM defect.

175. FCA US LLC intended to deceive Plaintiffs by continuing to market the vehicle and concealing the existence of a known TIPM defect which posed major safety concerns.

176. Had the omitted information been disclosed, Plaintiffs reasonably would have behaved differently.

177. Plaintiffs were harmed.

178. FCA US LLC's concealment of the TIPM defect was a substantial factor in causing Plaintiffs' harm.

179. The concealment substantially influenced Plaintiffs to purchase to Subject Vehicle; Plaintiffs would not have purchased the vehicle had the TIPM defect been disclosed prior to sale.

180. The concealed TIPM defect was material.

**FOURTH CAUSE OF ACTION**

**(Negligent Repair)**

**(Against Defendant PECK JEEP EAGLE Only)**

181. Plaintiffs incorporate herein by reference each and every allegation contained in the preceding and succeeding paragraphs as though herein fully restated and re-alleged.

182. Plaintiffs delivered the Subject Vehicle to Defendant PECK JEEP EAGLE for repair of on numerous occasions.

183. Defendant PECK JEEP EAGLE owed a duty to Plaintiffs to use ordinary care and skill in storage, preparation and repair of the Subject Vehicle in accordance with industry standards.

184. Defendant PECK JEEP EAGLE breached its duty to Plaintiffs to use ordinary care and skill by failing to properly store, prepare and repair of the Subject Vehicle in accordance with industry standards.

185. Defendant PECK JEEP EAGLE's negligent breach of its duties owed to Plaintiffs was a proximate cause of Plaintiffs' damages.

///

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs pray for judgment against Defendants, as follows:

a. For general, special and actual damages according to proof at trial;

b. For rescission of the purchase contract and restitution of all monies expended;

c. For diminution in value;

d. For incidental and consequential damages according to proof at trial;

e. For civil penalty in the amount of two times Plaintiffs' actual damages;

f. For prejudgment interest at the legal rate;

g. For injunctive and equitable relief;

h. For punitive damages pursuant to Civil Code sections 1780 and 3294;

i. For reasonable attorney fees and costs of suit; and

j. For such other relief as the Court deems just and proper under the circumstances.

Dated: March 29, 2016

**O'CONNOR & MIKHOV LLP**

Steve Mikhov (SBN 224676)
Lauren A. Ungs (SBN 273374)
Amy Morse (SBN 290502)
Attorneys for Plaintiffs,
PETER PETROPOULOS and
CONNIE NELSON

# EXHIBIT 1

Dealer Number 61601 Contract Number BC598124 R.O.S. Number ______ Stock Number BC598124

| Buyer Name and Address (Including County and Zip Code) | Co-Buyer Name and Address (Including County and Zip Code) | Creditor-Seller (Name and Address) |
|---|---|---|
| PETER PETROPOULOS<br>11278 CARMEL CREEK ROAD<br>SAN DIEGO CA SAN DIEGO 92130 | CONNIE NELSON<br>11278 CARMEL CREEK ROAD<br>SAN DIEGO CA 92130 | RANCHO CHRYSLER JEEP DODGE<br>8010 BALBOA AVENUE<br>SAN DIEGO CA 9211 |

You, the Buyer (and Co-Buyer, if any), may buy the vehicle below for cash or on credit. By signing this contract, you choose to buy the vehicle on credit under the agreements on the front and back of this contract. You agree to pay the Creditor - Seller (sometimes "we" or "us" in this contract) the Amount Financed and Finance Charge in U.S. funds according to the payment schedule below. We will figure your finance charge on a daily basis. The Truth-In-Lending Disclosures below are part of this contract.

| New Used | Year | Make and Model | Odometer | Vehicle Identification Number | Primary Use For Which Purchased |
|---|---|---|---|---|---|
| NEW | 2011 | DODGE DURANGO | 2 | 1D4RD4GGXBC598124 | ☒ personal, family or household<br>☐ business or commercial |

## FEDERAL TRUTH-IN-LENDING DISCLOSURES

| ANNUAL PERCENTAGE RATE The cost of your credit as a yearly rate. | FINANCE CHARGE The dollar amount the credit will cost you. | Amount Financed The amount of credit provided to you or on your behalf. | Total of Payments The amount you will have paid after you have made all payments as scheduled. | Total Sale Price The total cost of your purchase on credit, including your down payment of $ 0.00 is |
|---|---|---|---|---|
| 4.25 % | $ 6783.69 (e) | $ 42429.39 | $ 49213.08 (e) | $ 49213.08 (e) |

(e) means an estimate

**YOUR PAYMENT SCHEDULE WILL BE:**

| Number of Payments: | Amount of Payments: | When Payments Are Due: |
|---|---|---|
| One Payment of | N/A | N/A |
| One Payment of | N/A | N/A |
| 83 Payments | 585.87 | Monthly, Beginning 04/20/11 |
| Payments | N/A | Monthly, Beginning |
| One Final Payment | 585.87 | 03/20/2018 |

**Late Charge.** If payment is not received in full within 10 days after it is due, you will pay a late charge of 5% of the part of the payment that is late.
**Prepayment.** If you pay off all your debt early, you may be charged a minimum finance charge.
**Security Interest.** You are giving a security interest in the vehicle being purchased.
**Additional Information:** See this contract for more information including information about nonpayment, default, any required repayment in full before the scheduled date, minimum finance charges, and security interest.

**ITEMIZATION OF THE AMOUNT FINANCED** (Seller may keep part of the amounts paid to others.)

1. **Total Cash Price**
   A. Cash Price of Motor Vehicle and Accessories $ 35678.00 (A)
      1. Cash Price Vehicle $ 35678.00
      2. Cash Price Accessories $ N/A
      3. Other (Nontaxable)
         Describe N/A $ N/A
         Describe N/A $ N/A
   B. Document Preparation Fee (not a governmental fee) $ 55.00 (B)
   C. Smog Fee Paid to Seller $ N/A (C)
   D. (Optional) Theft Deterrent Device (to whom paid) N/A $ N/A (D)
   E. (Optional) Theft Deterrent Device (to whom paid) N/A $ N/A (E)
   F. (Optional) Theft Deterrent Device (to whom paid) N/A $ N/A (F)
   G. (Optional) Surface Protection Product (to whom paid) N/A $ N/A (G)
   H. (Optional) Surface Protection Product (to whom paid) N/A $ N/A (H)
   I. Sales Tax (on taxable items in A through H) $ 3126.64 (I)
   J. Optional DMV Electronic Filing Fee $ 29.00 (J)
   K. (Optional) Service Contract (to whom paid) JM&A VSC $ 3036.00 (K)
   L. (Optional) Service Contract (to whom paid) $ N/A (L)
   M. (Optional) Service Contract (to whom paid) $ N/A (M)
   N. (Optional) Service Contract (to whom paid) $ N/A (N)
   O. (Optional) Service Contract (to whom paid) $ N/A (O)
   P. Prior Credit or Lease Balance paid by Seller to N/A $ N/A (P)
      (see downpayment and trade-in calculation)
   Q. (Optional) Gap Contract (to whom paid) $ N/A (Q)
   R. (Optional) Used Vehicle Contract Cancellation Option Agreement $ N/A (R)
      N/A $ N/A (S)

## STATEMENT OF INSURANCE

**NOTICE.** No person is required as a condition of financing the purchase of a motor vehicle to purchase or negotiate any insurance through a particular insurance company, agent or broker. You are not required to buy any other insurance to obtain credit. Your decision to buy or not buy other insurance will not be a factor in the credit approval process.

### Vehicle Insurance

| | Term | Premium |
|---|---|---|
| $ N/A Ded. Comp., Fire & Theft | N/A Mos. | $ N/A |
| $ N/A Ded. Collision | N/A Mos. | $ N/A |
| Bodily Injury $ N/A Limits | N/A Mos. | $ N/A |
| Property Damage $ N/A Limits | N/A Mos. | $ N/A |
| Medical N/A | N/A Mos. | $ N/A |
| N/A | N/A Mos. | $ N/A |
| Total Vehicle Insurance Premiums | | $ N/A |

UNLESS A CHARGE IS INCLUDED IN THIS AGREEMENT FOR PUBLIC LIABILITY OR PROPERTY DAMAGE INSURANCE, PAYMENT FOR SUCH COVERAGE IS NOT PROVIDED BY THIS AGREEMENT.

You may buy the physical damage insurance this contract requires (see back) from anyone you choose who is acceptable to us. You are not required to buy any other insurance to obtain credit.

Buyer X [signature]
Co-Buyer X [signature]
Seller X [signature]

If any insurance is checked below, policies or certificates from the named insurance companies will describe the terms and conditions.

### Application for Optional Credit Insurance

☐ Credit Life: ☐ Buyer ☐ Co-Buyer ☐ Both
☐ Credit Disability (Buyer Only)

| | Term | Exp. | Premium |
|---|---|---|---|
| Credit Life | N/A Mos. | N/A | $ N/A |
| Credit Disability | N/A Mos. | N/A | $ N/A |
| Total Credit Insurance Premiums | | | $ N/A (b) |

Insurance Company Name N/A
N/A
Home Office Address N/A
N/A

Credit life insurance and credit disability insurance are not required to obtain credit. Your decision to buy or not buy credit life and credit disability insurance will not be a factor in the credit approval process. They will not be provided unless you sign and agree to pay the extra cost. Credit life insurance is based on your original payment schedule. This insurance may not pay all you owe on this contract if you make late payments. Credit disability insurance does not cover any increase in your payment or in the number of payments. Coverage for credit life insurance and credit disability insurance ends on the original due date for the last payment unless a different term for the insurance is shown above.

You are applying for the credit insurance marked above. Your signature below means that you agree that: (1) You are not eligible for insurance if you have reached your 65th birthday. (2) You are eligible for disability insurance only if you are working for wages or profit 30 hours a week or more on the Effective Date. (3) Only the Primary Buyer is eligible for

N. (Optional) Service Contract (to whom paid) $ N/A (N)
O. (Optional) Service Contract (to whom paid) $ N/A (O)
P. Prior Credit or Lease Balance paid by Seller to N/A $ N/A (P)
(see downpayment and trade-in calculation)
Q. (Optional) Gap Contract (to whom paid) $ N/A (Q)
R. (Optional) Used Vehicle Contract Cancellation Option Agreement $ N/A (R)
S. Other (to whom paid) N/A $ N/A (S)
For N/A
Total Cash Price (A through S) $ 41924.64 (1)

2. Amounts Paid to Public Officials
A. License Fees $ 411.00 (A)
B. Registration/Transfer/Titling Fees $ 65.00 (B)
C. California Tire Fees $ 8.75 (C)
D. Other Smog Abatement Fee $ 20.00 (D)
Total Official Fees (A through D) $ 504.75 (2)

3. Amount Paid to Insurance Companies
(Total premiums from Statement of Insurance column a + b) $ N/A (3)

4. ☐ Smog Certification or ☐ Exemption Fee Paid to State $ N/A (4)

5. Subtotal (1 through 4) $ 42429.39 (5)

6. Total Downpayment
A. Agreed Trade-In Value Yr 2005 Make DODGE $ 8500.00 (A)
Model DURANGO LI Odom 108852
VIN 1D4HD58D05F508391
B. Less Prior Credit or Lease Balance $ 8500.00 (B)
C. Net Trade-In (A less B) (indicate if a negative number) $ N/A (C)
D. Deferred Downpayment $ N/A (D)
E. Manufacturer's Rebate $ N/A (E)
F. Other $ N/A (F)
G. Cash $ N/A (G)
Total Downpayment (C through G) $ 0.00 (6)
(If negative, enter zero on line 6 and enter the amount less than zero as a positive number on line 1P above)

7. Amount Financed (5 less 6) $ 42429.39 (7)

Insurance and credit disability insurance ends on the original due date for the last payment unless a different term for the insurance is shown above.

You are applying for the credit insurance marked above. Your signature below means that you agree that: (1) You are not eligible for insurance if you have reached your 65th birthday. (2) You are eligible for disability insurance only if you are working for wages or profit 30 hours a week or more on the Effective Date. (3) Only the Primary Buyer is eligible for disability insurance. DISABILITY INSURANCE MAY NOT COVER CONDITIONS FOR WHICH YOU HAVE SEEN A DOCTOR OR CHIROPRACTOR IN THE LAST 6 MONTHS (Refer to "Total Disabilities Not Covered" in your policy for details).
You want to buy the credit insurance.

N/A X N/A
Date Buyer Signature Age

N/A X N/A
Date Co-Buyer Signature Age

OPTIONAL GAP CONTRACT A gap contract (debt cancellation contract) is not required to obtain credit and will not be provided unless you sign below and agree to pay the extra charge. If you choose to buy a gap contract, the charge is shown in item 1Q of the Itemization of Amount Financed. See your gap contract for details on the terms and conditions it provides. It is a part of this contract.

Term N/A Mos. N/A
Name of Gap Contract

I want to buy a gap contract.

Buyer Signs X N/A

OPTIONAL SERVICE CONTRACT(S) You want to purchase the service contract(s) written with the following company(ies) for the term(s) shown below for the charge(s) shown in item 1K, 1L, 1M, 1N, and/or 1O.

1K Company JM&A VSC
Term 72 Mos. or 100000 Miles
1L Company N/A
Term N/A Mos. or N/A Miles
1M Company N/A
Term N/A Mos. or N/A Miles
1N Company N/A
Term N/A Mos. or N/A Miles
1O Company N/A
Term N/A Mos. or N/A Miles
Buyer X [signature]

SELLER ASSISTED LOAN

BUYER MAY BE REQUIRED TO PLEDGE SECURITY FOR THE LOAN, AND WILL BE OBLIGATED FOR THE INSTALLMENT PAYMENTS ON BOTH THIS RETAIL INSTALLMENT SALE CONTRACT AND THE LOAN.

Proceeds of Loan From: N/A
Amount $ N/A Finance Charge $ N/A
Total $ N/A Payable in N/A
Installments of $ N/A $ N/A
from this Loan is shown in item 6D.

**AUTO BROKER FEE DISCLOSURE**

**If this contract reflects the retail sale of a new motor vehicle, the sale is not subject to a fee received by an autobroker from us unless the following box is checked:**

☐ **Name of autobroker receiving fee, if applicable:**

**HOW THIS CONTRACT CAN BE CHANGED.** This contract contains the entire agreement between you and us relating to this contract. Any change to the contract must be in writing and both you and we must sign it. No oral changes are binding.

Buyer Signs X [signature]
Co-Buyer Signs X [signature]

**SELLER'S RIGHT TO CANCEL** If Buyer and Co-Buyer sign here, the provisions of the Seller's Right to Cancel section on the back giving the Seller the right to cancel if Seller is unable to assign this contract to a financial institution will apply.

X [signature] X [signature]
Buyer Co-Buyer

OPTION: ☐ You pay no finance charge if the Amount Financed, item 7, is paid in full on or before N/A, Year ____. SELLER'S INITIALS ____

THE MINIMUM PUBLIC LIABILITY INSURANCE LIMITS PROVIDED IN LAW MUST BE MET BY EVERY PERSON WHO PURCHASES A VEHICLE. IF YOU ARE UNSURE WHETHER OR NOT YOUR CURRENT INSURANCE POLICY WILL COVER YOUR NEWLY ACQUIRED VEHICLE IN THE EVENT OF AN ACCIDENT, YOU SHOULD CONTACT YOUR INSURANCE AGENT.

WARNING:

YOUR PRESENT POLICY MAY NOT COVER COLLISION DAMAGE OR MAY NOT PROVIDE FOR FULL REPLACEMENT COSTS FOR THE VEHICLE BEING PURCHASED. IF YOU DO NOT HAVE FULL COVERAGE, SUPPLEMENTAL COVERAGE FOR COLLISION DAMAGE MAY BE AVAILABLE TO YOU THROUGH YOUR INSURANCE AGENT OR THROUGH THE SELLING DEALER. HOWEVER, UNLESS OTHERWISE SPECIFIED, THE COVERAGE YOU OBTAIN THROUGH THE DEALER PROTECTS ONLY THE DEALER, USUALLY UP TO THE AMOUNT OF THE UNPAID BALANCE REMAINING AFTER THE VEHICLE HAS BEEN REPOSSESSED AND SOLD.

FOR ADVICE ON FULL COVERAGE THAT WILL PROTECT YOU IN THE EVENT OF LOSS OR DAMAGE TO YOUR VEHICLE, YOU SHOULD CONTACT YOUR INSURANCE AGENT.

THE BUYER SHALL SIGN TO ACKNOWLEDGE THAT HE/SHE UNDERSTANDS THESE PUBLIC LIABILITY TERMS AND CONDITIONS.

S/S X [signature] X [signature]

Payoff Agreement: Seller relied on information from you and/or the lienholder or lessor of your trade-in vehicle to arrive at the payoff amount shown in item 6B of the Itemization of Amount Financed as the "Prior Credit or Lease Balance." Seller agrees to pay the payoff amount shown in 6B to the lienholder or lessor of the trade-in vehicle, or its designee. If the actual payoff amount is more than the amount shown in 6B, you must pay the Seller the excess on demand. If the actual payoff amount is less than the amount shown in 6B, Seller will refund the difference to you. Except as stated in the "NOTICE" on the back of this contract, any assignee of this contract will not be obligated to pay the Prior Credit or Lease Balance shown in 6B or any refund due from the Seller.

Buyer Signature X [signature] Co-Buyer Signature X [signature]

**Notice to buyer: (1) Do not sign this agreement before you read it or if it contains any blank spaces to be filled in. (2) You are entitled to a completely filled in copy of this agreement. (3) You can prepay the full amount due under this agreement at any time. (4) If you default in the performance of your obligations under this agreement, the vehicle may be repossessed and you may be subject to suit and liability for the unpaid indebtedness evidenced by this agreement.**

Installments of $ N/A $ N/A
from this Loan is shown in Item 6D.

applicable:

Buyer X

**HOW THIS CONTRACT CAN BE CHANGED.** This contract contains the entire agreement between you and us relating to this contract. Any change to the contract must be in writing and both you and we must sign it. No oral changes are binding.

Buyer Signs X
Co-Buyer Signs X

**SELLER'S RIGHT TO CANCEL** If Buyer and Co-Buyer sign here, the provisions of the Seller's Right to Cancel section on the back giving the Seller the right to cancel if Seller is unable to assign this contract to a financial institution will apply.

X ______ Buyer  X ______ Co-Buyer

**OPTION:** ☐ You pay no finance charge if the Amount Financed, item 7, is paid in full on or before N/A , Year ____ . SELLER'S INITIALS ______

THE MINIMUM PUBLIC LIABILITY INSURANCE LIMITS PROVIDED IN LAW MUST BE MET BY EVERY PERSON WHO PURCHASES A VEHICLE. IF YOU ARE UNSURE WHETHER OR NOT YOUR CURRENT INSURANCE POLICY WILL COVER YOUR NEWLY ACQUIRED VEHICLE IN THE EVENT OF AN ACCIDENT, YOU SHOULD CONTACT YOUR INSURANCE AGENT.

WARNING:

YOUR PRESENT POLICY MAY NOT COVER COLLISION DAMAGE OR MAY NOT PROVIDE FOR FULL REPLACEMENT COSTS FOR THE VEHICLE BEING PURCHASED. IF YOU DO NOT HAVE FULL COVERAGE, SUPPLEMENTAL COVERAGE FOR COLLISION DAMAGE MAY BE AVAILABLE TO YOU THROUGH YOUR INSURANCE AGENT OR THROUGH THE SELLING DEALER. HOWEVER, UNLESS OTHERWISE SPECIFIED, THE COVERAGE YOU OBTAIN THROUGH THE DEALER PROTECTS ONLY THE DEALER, USUALLY UP TO THE AMOUNT OF THE UNPAID BALANCE REMAINING AFTER THE VEHICLE HAS BEEN REPOSSESSED AND SOLD.

FOR ADVICE ON FULL COVERAGE THAT WILL PROTECT YOU IN THE EVENT OF LOSS OR DAMAGE TO YOUR VEHICLE, YOU SHOULD CONTACT YOUR INSURANCE AGENT.

THE BUYER SHALL SIGN TO ACKNOWLEDGE THAT HE/SHE UNDERSTANDS THESE PUBLIC LIABILITY TERMS AND CONDITIONS.

S/S X ______ X ______

Payoff Agreement: Seller relied on information from you and/or the lienholder or lessor of your trade-in vehicle to arrive at the payoff amount shown in Item 6B of the Itemization of Amount Financed as the "Prior Credit or Lease Balance." Seller agrees to pay the payoff amount shown in 6B to the lienholder or lessor of the trade-in vehicle, or its designee. If the actual payoff amount is more than the amount shown in 6B, you must pay the Seller the excess on demand. If the actual payoff amount is less than the amount shown in 6B, Seller will refund the difference to you. Except as stated in the "NOTICE" on the back of this contract, any assignee of this contract will not be obligated to pay the Prior Credit or Lease Balance shown in 6B or any refund due from the Seller.

Buyer Signature X ______ Co-Buyer Signature X ______

**Notice to buyer: (1) Do not sign this agreement before you read it or if it contains any blank spaces to be filled in. (2) You are entitled to a completely filled in copy of this agreement. (3) You can prepay the full amount due under this agreement at any time. (4) If you default in the performance of your obligations under this agreement, the vehicle may be repossessed and you may be subject to suit and liability for the unpaid indebtedness evidenced by this agreement.**

**If you have a complaint concerning this sale, you should try to resolve it with the seller.**

**Complaints concerning unfair or deceptive practices or methods by the seller may be referred to the city attorney, the district attorney, or an investigator for the Department of Motor Vehicles, or any combination thereof.**

**After this contract is signed, the seller may not change the financing or payment terms unless you agree in writing to the change. You do not have to agree to any change, and it is an unfair or deceptive practice for the seller to make a unilateral change.**

Buyer Signature X ______ Co-Buyer Signature X ______

***The Annual Percentage Rate may be negotiable with the Seller. The Seller may assign this contract and retain its right to receive a part of the Finance Charge.***

**THERE IS NO COOLING-OFF PERIOD UNLESS YOU OBTAIN A CONTRACT CANCELLATION OPTION**

California law does not provide for a "cooling-off" or other cancellation period for vehicle sales. Therefore, you cannot later cancel this contract simply because you change your mind, decide the vehicle costs too much, or wish you had acquired a different vehicle. After you sign below, you may only cancel this contract with the agreement of the seller or for legal cause, such as fraud. However, California law does require a seller to offer a 2-day contract cancellation option on used vehicles with a purchase price of less than $40,000, subject to certain statutory conditions. This contract cancellation option requirement does not apply to the sale of a recreational vehicle, a motorcycle, or an off-highway motor vehicle subject to identification under California law. See the vehicle contract cancellation option agreement for details.

**YOU AGREE TO THE TERMS OF THIS CONTRACT. YOU CONFIRM THAT BEFORE YOU SIGNED THIS CONTRACT, WE GAVE IT TO YOU, AND YOU WERE FREE TO TAKE IT AND REVIEW IT. YOU ACKNOWLEDGE THAT YOU HAVE READ BOTH SIDES OF THIS CONTRACT, INCLUDING THE ARBITRATION CLAUSE ON THE REVERSE SIDE, BEFORE SIGNING BELOW. *YOU CONFIRM THAT YOU RECEIVED A COMPLETELY FILLED-IN COPY WHEN YOU SIGNED IT.***

Buyer Signature X ______ Date 03/06/11 Co-Buyer Signature X ______ Date 03/06/11

Co-Buyers and Other Owners — A co-buyer is a person who is responsible for paying the entire debt. An other owner is a person whose name is on the title to the vehicle but does not have to pay the debt. The other owner agrees to the security interest in the vehicle given to us in this contract.

Other Owner Signature X N/A Address ______

**GUARANTY:** To induce us to sell the vehicle to Buyer, each person who signs as a Guarantor individually guarantees the payment of this contract. If Buyer fails to pay any money owing on this contract, each Guarantor must pay it when asked. Each Guarantor will be liable for the total amount owing even if other persons also sign as Guarantor, and even if Buyer has a complete defense to Guarantor's demand for reimbursement. Each Guarantor agrees to be liable even if we do one or more of the following: (1) give the Buyer more time to pay one or more payments; (2) give a full or partial release to any other Guarantor; (3) release any security; (4) accept less from the Buyer than the total amount owing; or (5) otherwise reach a settlement relating to this contract or extend the contract. Each Guarantor acknowledges receipt of a completed copy of this contract and guaranty at the time of signing.

Guarantor waives notice of acceptance of this Guaranty, notice of the Buyer's non-payment, non-performance, and default; and notices of the amount owing at any time, and of any demands upon the Buyer.

Guarantor X N/A Date N/A Guarantor X N/A Date N/A
Address N/A Address N/A

Seller Signs RANCHO CHRYSLER JEEP DODGE Date 03/06/11 By X ______ Title FIN MGR.

**SUPERIOR COURT OF CALIFORNIA, COUNTY OF SAN DIEGO**
STREET ADDRESS: 330 W Broadway
MAILING ADDRESS: 330 W Broadway
CITY AND ZIP CODE: San Diego, CA 92101-3827
BRANCH NAME: Central
TELEPHONE NUMBER: (619) 450-7071

PLAINTIFF(S) / PETITIONER(S): Peter Petropoulos et.al.

DEFENDANT(S) / RESPONDENT(S): FCA US LLC et.al.

PETROPOULOS VS FCA US LLC [IMAGED]

| NOTICE OF CASE ASSIGNMENT and CASE MANAGEMENT CONFERENCE | CASE NUMBER: 37-2016-00010501-CU-BC-CTL |
|---|---|

**CASE ASSIGNMENT**

Judge: Gregory W Pollack Department: C-71

**COMPLAINT/PETITION FILED:** 03/30/2016

| TYPE OF HEARING SCHEDULED | DATE | TIME | DEPT | JUDGE |
|---|---|---|---|---|
| Civil Case Management Conference | 09/02/2016 | 01:00 pm | C-71 | Gregory W Pollack |

A case management statement must be completed by counsel for all parties or self-represented litigants and timely filed with the court at least 15 days prior to the initial case management conference. (San Diego Local Rules, Division II, CRC Rule 3.725).

All counsel of record or parties in pro per shall appear at the Case Management Conference, be familiar with the case, and be fully prepared to participate effectively in the hearing, including discussions of ADR* options.

---

IT IS THE DUTY OF EACH PLAINTIFF (AND CROSS-COMPLAINANT) TO SERVE A COPY OF THIS NOTICE WITH THE COMPLAINT (AND CROSS-COMPLAINT), THE ALTERNATIVE DISPUTE RESOLUTION (ADR) INFORMATION FORM (SDSC FORM #CIV-730), A STIPULATION TO USE ALTERNATIVE DISPUTE RESOLUTION (ADR) (SDSC FORM #CIV-359), AND OTHER DOCUMENTS AS SET OUT IN SDSC LOCAL RULE 2.1.5.

ALL COUNSEL WILL BE EXPECTED TO BE FAMILIAR WITH SUPERIOR COURT RULES WHICH HAVE BEEN PUBLISHED AS DIVISION II, AND WILL BE STRICTLY ENFORCED.

TIME STANDARDS: The following timeframes apply to general civil cases and must be adhered to unless you have requested and been granted an extension of time. General civil cases consist of all civil cases except: small claims proceedings, civil petitions, unlawful detainer proceedings, probate, guardianship, conservatorship, juvenile, parking citation appeals, and family law proceedings.

COMPLAINTS: Complaints and all other documents listed in SDSC Local Rule 2.1.5 must be served on all named defendants.

DEFENDANT'S APPEARANCE: Defendant must generally appear within 30 days of service of the complaint. (Plaintiff may stipulate to no more than 15 day extension which must be in writing and filed with the Court.) (SDSC Local Rule 2.1.6)

JURY FEES: In order to preserve the right to a jury trial, one party for each side demanding a jury trial shall pay an advance jury fee in the amount of one hundred fifty dollars ($150) on or before the date scheduled for the initial case management conference in the action.

*ALTERNATIVE DISPUTE RESOLUTION (ADR): THE COURT ENCOURAGES YOU TO CONSIDER UTILIZING VARIOUS ALTERNATIVES TO TRIAL, INCLUDING MEDIATION AND ARBITRATION, PRIOR TO THE CASE MANAGEMENT CONFERENCE. PARTIES MAY FILE THE ATTACHED STIPULATION TO USE ALTERNATIVE DISPUTE RESOLUTION (SDSC FORM #CIV-359).

Superior Court of California
County of San Diego

# NOTICE OF ELIGIBILITY TO eFILE AND ASSIGNMENT TO IMAGING DEPARTMENT

**This case is eligible for eFiling. Should you prefer to electronically file documents, refer to General Order 051414 at www.sdcourt.ca.gov for rules and procedures or contact the Court's eFiling vendor at www.onelegal.com for information.**

**This case has been assigned to an Imaging Department and original documents attached to pleadings filed with the court will be imaged and destroyed. Original documents should not be filed with pleadings. If necessary, they should be lodged with the court under California Rules of Court, rule 3.1302(b).**

On August 1, 2011 the San Diego Superior Court began the Electronic Filing and Imaging Pilot Program ("Program"). As of August 1, 2011 in all new cases assigned to an Imaging Department all filings will be imaged electronically and the electronic version of the document will be the official court file. The official court file will be electronic and accessible at one of the kiosks located in the Civil Business Office and on the Internet through the court's website.

You should be aware that the electronic copy of the filed document(s) will be the official court record pursuant to Government Code section 68150. The paper filing will be imaged and held for 30 days. After that time it will be destroyed and recycled. **Thus, you should not attach any original documents to pleadings filed with the San Diego Superior Court. Original documents filed with the court will be imaged and destroyed except those documents specified in California Rules of Court, rule 3.1806.** Any original documents necessary for a motion hearing or trial shall be lodged in advance of the hearing pursuant to California Rules of Court, rule 3.1302(b).

It is the duty of each plaintiff, cross-complainant or petitioner to serve a copy of this notice with the complaint, cross-complaint or petition on all parties in the action.

On all pleadings filed after the initial case originating filing, all parties must, to the extent it is feasible to do so, place the words **"IMAGED FILE"** in all caps immediately under the title of the pleading on all subsequent pleadings filed in the action.

## Please refer to the General Order - Imaging located on the San Diego Superior Court website at:

http://www.sdcourt.ca.gov/CivilImagingGeneralOrder

# SUPERIOR COURT OF CALIFORNIA, COUNTY OF SAN DIEGO

## ALTERNATIVE DISPUTE RESOLUTION (ADR) INFORMATION

CASE NUMBER: 37-2016-00010501-CU-BC-CTL CASE TITLE: Petropoulos vs FCA US LLC [IMAGED]

**<u>NOTICE</u>: All plaintiffs/cross-complainants in a general civil case are required to serve a copy of the following three forms on each defendant/cross-defendant, together with the complaint/cross-complaint:**
**(1) this Alternative Dispute Resolution (ADR) Information form (SDSC form #CIV-730),**
**(2) the Stipulation to Use Alternative Dispute Resolution (ADR) form (SDSC form #CIV-359), *<u>and</u>***
**(3) the Notice of Case Assignment form (SDSC form #CIV-721).**

Most civil disputes are resolved without filing a lawsuit, and most civil lawsuits are resolved without a trial. The courts, community organizations, and private providers offer a variety of Alternative Dispute Resolution (ADR) processes to help people resolve disputes without a trial. The San Diego Superior Court expects that litigants will utilize some form of ADR as a mechanism for case settlement before trial, and it may be beneficial to do this early in the case.

Below is some information about the potential advantages and disadvantages of ADR, the most common types of ADR, and how to find a local ADR program or neutral. A form for agreeing to use ADR is attached (SDSC form #CIV-359).

**<u>Potential Advantages and Disadvantages of ADR</u>**
ADR may have a variety of advantages or disadvantages over a trial, depending on the type of ADR process used and the particular case:

**Potential Advantages**
- Saves time
- Saves money
- Gives parties more control over the dispute resolution process and outcome
- Preserves or improves relationships

**Potential Disadvantages**
- May take more time and money if ADR does not resolve the dispute
- Procedures to learn about the other side's case (discovery), jury trial, appeal, and other court protections may be limited or unavailable

**<u>Most Common Types of ADR</u>**
You can read more information about these ADR processes and watch videos that demonstrate them on the court's ADR webpage at <u>http://www.sdcourt.ca.gov/adr</u>.

**Mediation:** A neutral person called a "mediator" helps the parties communicate in an effective and constructive manner so they can try to settle their dispute. The mediator does not decide the outcome, but helps the parties to do so. Mediation is usually confidential, and may be particularly useful when parties want or need to have an ongoing relationship, such as in disputes between family members, neighbors, co-workers, or business partners, or when parties want to discuss non-legal concerns or creative resolutions that could not be ordered at a trial.

**Settlement Conference:** A judge or another neutral person called a "settlement officer" helps the parties to understand the strengths and weaknesses of their case and to discuss settlement. The judge or settlement officer does not make a decision in the case but helps the parties to negotiate a settlement. Settlement conferences may be particularly helpful when the parties have very different ideas about the likely outcome of a trial and would like an experienced neutral to help guide them toward a resolution.

**Arbitration:** A neutral person called an "arbitrator" considers arguments and evidence presented by each side and then decides the outcome of the dispute. Arbitration is less formal than a trial, and the rules of evidence are usually relaxed. If the parties agree to binding arbitration, they waive their right to a trial and agree to accept the arbitrator's decision as final. With nonbinding arbitration, any party may reject the arbitrator's decision and request a trial. Arbitration may be appropriate when the parties want another person to decide the outcome of their dispute but would like to avoid the formality, time, and expense of a trial.

**Other ADR Processes:** There are several other types of ADR which are not offered through the court but which may be obtained privately, including neutral evaluation, conciliation, fact finding, mini-trials, and summary jury trials. Sometimes parties will try a combination of ADR processes. The important thing is to try to find the type or types of ADR that are most likely to resolve your dispute. Be sure to learn about the rules of any ADR program and the qualifications of any neutral you are considering, and about their fees.

## Local ADR Programs for Civil Cases

**Mediation:** The San Diego Superior Court maintains a Civil Mediation Panel of approved mediators who have met certain minimum qualifications and have agreed to charge $150 per hour for each of the first two (2) hours of mediation and their regular hourly rate thereafter in court-referred mediations.

On-line mediator search and selection: Go to the court's ADR webpage at www.sdcourt.ca.gov/adr and click on the "Mediator Search" to review individual mediator profiles containing detailed information about each mediator including their dispute resolution training, relevant experience, ADR specialty, education and employment history, mediation style, and fees and to submit an on-line Mediator Selection Form (SDSC form #CIV-005). The Civil Mediation Panel List, the Available Mediator List, individual Mediator Profiles, and Mediator Selection Form (CIV-005) can also be printed from the court's ADR webpage and are available at the Mediation Program Office or Civil Business Office at each court location.

**Settlement Conference:** The judge may order your case to a mandatory settlement conference, or voluntary settlement conferences may be requested from the court if the parties certify that: (1) settlement negotiations between the parties have been pursued, demands and offers have been tendered in good faith, and resolution has failed; (2) a judicially supervised settlement conference presents a substantial opportunity for settlement; and (3) the case has developed to a point where all parties are legally and factually prepared to present the issues for settlement consideration and further discovery for settlement purposes is not required. Refer to SDSC Local Rule 2.2.1 for more information. To schedule a settlement conference, contact the department to which your case is assigned.

**Arbitration:** The San Diego Superior Court maintains a panel of approved judicial arbitrators who have practiced law for a minimum of five years and who have a certain amount of trial and/or arbitration experience. Refer to SDSC Local Rules Division II, Chapter III and Code Civ. Proc. § 1141.10 et seq or contact the Arbitration Program Office at (619) 450-7300 for more information.

More information about court-connected ADR: Visit the court's ADR webpage at www.sdcourt.ca.gov/adr or contact the court's Mediation/Arbitration Office at (619) 450-7300.

**Dispute Resolution Programs Act (DRPA) funded ADR Programs:** The following community dispute resolution programs are funded under DRPA (Bus. and Prof. Code §§ 465 et seq.):

- In Central, East, and South San Diego County, contact the National Conflict Resolution Center (NCRC) at www.ncrconline.com or (619) 238-2400.
- In North San Diego County, contact North County Lifeline, Inc. at www.nclifeline.org or (760) 726-4900.

**Private ADR:** To find a private ADR program or neutral, search the Internet, your local telephone or business directory, or legal newspaper for dispute resolution, mediation, settlement, or arbitration services.

## Legal Representation and Advice

To participate effectively in ADR, it is generally important to understand your legal rights and responsibilities and the likely outcomes if you went to trial. ADR neutrals are not allowed to represent or to give legal advice to the participants in the ADR process. If you do not already have an attorney, the California State Bar or your local County Bar Association can assist you in finding an attorney. Information about obtaining free and low cost legal assistance is also available on the California courts website at *www.courtinfo.ca.gov/selfhelp/lowcost*.

| SUPERIOR COURT OF CALIFORNIA, COUNTY OF SAN DIEGO | *FOR COURT USE ONLY* |
|---|---|
| STREET ADDRESS: 330 West Broadway<br>MAILING ADDRESS: 330 West Broadway<br>CITY, STATE, & ZIP CODE: San Diego, CA 92101-3827<br>BRANCH NAME: Central | |
| PLAINTIFF(S): Peter Petropoulos et.al. | |
| DEFENDANT(S): FCA US LLC et.al. | |
| SHORT TITLE: PETROPOULOS VS FCA US LLC [IMAGED] | |
| **STIPULATION TO USE ALTERNATIVE DISPUTE RESOLUTION (ADR)** | CASE NUMBER:<br>37-2016-00010501-CU-BC-CTL |

Judge: Gregory W Pollack

Department: C-71

The parties and their attorneys stipulate that the matter is at issue and the claims in this action shall be submitted to the following alternative dispute resolution (ADR) process. Selection of any of these options will not delay any case management timelines.

- ☐ Mediation (court-connected)
- ☐ Mediation (private)
- ☐ Voluntary settlement conference (private)
- ☐ Neutral evaluation (private)
- ☐ Non-binding private arbitration
- ☐ Binding private arbitration
- ☐ Non-binding judicial arbitration (discovery until 15 days before trial)
- ☐ Non-binding judicial arbitration (discovery until 30 days before trial)
- ☐ Other (*specify e.g., private mini-trial, private judge, etc.*): ____________________

It is also stipulated that the following shall serve as arbitrator, mediator or other neutral: *(Name)* ____________________

Alternate neutral (for court Civil Mediation Program and arbitration only): ____________________

| | |
|---|---|
| Date: ____________ | Date: ____________ |
| Name of Plaintiff | Name of Defendant |
| Signature | Signature |
| Name of Plaintiff's Attorney | Name of Defendant's Attorney |
| Signature | Signature |

If there are more parties and/or attorneys, please attach additional completed and fully executed sheets.

It is the duty of the parties to notify the court of any settlement pursuant to Cal. Rules of Court, rule 3.1385. Upon notification of the settlement, the court will place this matter on a 45-day dismissal calendar.

No new parties may be added without leave of court.

**IT IS SO ORDERED.**

Dated: 03/30/2016

JUDGE OF THE SUPERIOR COURT